ORIGINAL

DAVID L. HENKIN            #6876
CAROLINE C. ISHIDA        #9475
EARTHJUSTICE
223 South King Street, Suite 400
Honolulu, Hawai'i 96813
Telephone No.: (808) 599-2436
Fax No.: (808) 521-6841
Email: dhenkin@earthjustice.org
          cishida@earthjustice.org

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

APR 16 2012

at ___10___ o'clock and ___25___ min. ___ M.
SUE BEITIA, CLERK

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF HAWAI'I

| | |
|---|---|
| HAWAI'I WILDLIFE FUND, a Hawai'i non-profit corporation, SIERRA CLUB - MAUI GROUP, a non-profit corporation, SURFRIDER FOUNDATION, a non-profit corporation, and WEST MAUI PRESERVATION ASSOCIATION, a Hawai'i non-profit corporation,<br><br>          Plaintiffs,<br><br>     v.<br><br>COUNTY OF MAUI,<br><br>          Defendant. | ) CIVIL NO. CV 12  00198 SOM BMK<br>)<br>) COMPLAINT FOR DECLARATORY<br>) AND INJUNCTIVE RELIEF;<br>) ~~SUMMONS~~<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## INTRODUCTION

1.     This complaint alleges violations under the Federal Water Pollution Control Act, also known as the Clean Water Act ("CWA"), caused by the discharge into the waters of West Maui of wastewater from injection wells operated by defendant County of Maui ("the County") at the Lahaina Wastewater Reclamation Facility ("LWRF") without the required National Pollutant Discharge Elimination System ("NPDES") permit.  Plaintiffs, Hawai'i Wildlife Fund, Sierra Club-Maui Group, Surfrider Foundation, and West Maui Preservation Association (collectively, "plaintiffs") allege on information and belief that wastewater (or "sewage") from the treatment facility is injected into the wells and then flows via groundwater through the subsurface into nearshore Maui ocean waters.  Plaintiffs further allege on information and belief that unpermitted discharges from the LWRF injection wells began prior to 2006, have continued on a daily basis up to the present, and, absent action by defendant to comply with the CWA, will continue.

2.     Defendant's actions at the injection wells at the LWRF have had detrimental effects on, and pose an ongoing threat to, the water quality and health of the nearshore coastal waters and ecosystem, particularly in the Kahekili Beach area of West Maui, where multiple freshwater seeps containing wastewater have been detected by researchers conducting scientific studies.

3.      Wastewater and additional pollutants from the LWRF – including, but not limited to, nitrogen, phosphorus, suspended solids, bacteria, pharmaceuticals, musk fragrances, and industrial chemicals – are continuously discharged into some or all of the four injection wells at the LWRF and continuously flow out into the ocean through the hydrologically connected groundwater.  The LWRF injects wastewater into the wells at an average of 3-5 million gallons per day.

4.      The CWA's National Pollutant Discharge Elimination System, 33 U.S.C. § 1342 and 40 C.F.R. pt. 122, regulates discharges to surface waters through hydrologically connected groundwater.

5.      To date, the County has failed to apply for, obtain or comply with the terms of an NPDES permit for its injection well discharges from the LWRF.  Because the County does not have a permit for the discharge of wastewater and additional pollutants from the LWRF into ocean waters via groundwater, it is in violation of the CWA.  33 U.S.C. § 1311(a).

6.      By this complaint, plaintiffs seek a declaratory judgment that the County has been and continues to be in violation of the CWA.  Plaintiffs additionally seek an injunction requiring the County promptly to apply for, obtain and comply with the terms of an NPDES permit to eliminate the LWRF's ongoing illegal discharges.  Plaintiffs also seek imposition of maximum civil penalties for defendant's longstanding and knowing violations of the CWA.

## JURISDICTION AND VENUE

7.     This lawsuit is brought pursuant to the CWA, 33 U.S.C §§ 1251 et seq. This Court has subject matter jurisdiction over the claims for relief set forth herein pursuant to 33 U.S.C. § 1365(a) (citizen suits to enforce effluent standards or limitations under the CWA), 28 U.S.C. § 1331 (actions arising under the laws of the United States), and 28 U.S.C. §§ 2201-02 (power to issue declaratory judgments in cases of actual controversy).

8.     On June 28, 2011, plaintiffs gave written notice of the violations set forth in this complaint, and of their intent to file suit on these CWA claims, to the Hawai'i Department of Health ("DOH"), Environmental Protection Agency ("EPA") Headquarters, EPA Region IX, and the County.  33 U.S.C. § 1365(b)(1)(A).

9.     More than sixty days has elapsed since service of plaintiffs' notice of intent to sue, as required by the CWA.  Id. § 1365(b)(1)(A).  Neither the EPA nor DOH has commenced or is diligently prosecuting a civil or criminal action in a court of the United States or a State to require the County to obtain an NPDES permit or otherwise address the violations alleged by plaintiffs in this complaint. Id. § 1365(b)(1)(B).

10.     Venue properly lies in this judicial district by virtue of CWA section 505(c)(1), id. § 1365(c)(1), because the source of the violations at issue is located within this judicial district.

11.     Defendant has failed to obtain and comply with the terms of an NPDES permit for the ongoing discharges of wastewater and other pollutants from the LWRF's injection wells into nearshore marine waters, and these CWA violations will persist on a continuous basis until defendant obtains an NPDES permit and complies with permit limits designed to be protective of nearshore water quality.

12.     Defendant's discharges began prior to 2006 and have continuously travelled from the LWRF's injection wells through subsurface water to the ocean, and, because the LWRF injects millions of gallons of wastewater and other pollutants into the wells on a daily basis, the violations are likely to continue unless and until defendant obtains and complies with the terms of a valid NPDES permit.

PARTIES

A.     <u>Plaintiffs</u>

13.     Plaintiff Hawai'i Wildlife Fund is a Hawai'i non-profit corporation committed to the protection of Hawai'i's native wildlife.  Hawai'i Wildlife Fund's staff, supporters, volunteers, and researchers intensively use the West Maui waters, including, but not limited to, the Kahekili Beach area, for snorkeling, swimming, stand-up paddling, SCUBA diving, whale watching, sea turtle surveys, and reef surveys.  Hawai'i Wildlife Fund has been involved in an ongoing critically endangered Hawksbill sea turtle recovery project in the nearshore waters of

Kahekili Beach, which includes surveys to locate turtles and involves spending several hours in the water per survey to swim line transects, record data, and take photographs.

14.     Hawaiʻi Wildlife Fund has given testimony and participated in past efforts to meet and work with local, state, and federal officials to promote reuse of wastewater from the LWRF, as well as to improve the quality of the wastewater that is injected into the LWRF's wells and protect nearshore West Maui water quality.

15.     Plaintiff Sierra Club, a non-profit organization focused on raising awareness of environmental issues and preserving the environment, files this complaint by and through its Maui Group.  The Sierra Club-Maui Group is a membership organization consisting of hundreds of members who reside on Maui. The group organizes community clean ups and other outdoor activities, and members of the Sierra Club-Maui Group regularly use the coastal areas and nearshore waters of West Maui, including, but not limited to, the Kahekili Beach area, for recreational activities like snorkeling, surfing, SCUBA diving, swimming, whale watching, and stand-up paddling.  The health of the marine waters and the nearshore ecosystem is essential for members of Sierra Club-Maui Group to participate in these activities.

16.     The Sierra Club-Maui Group has also been involved in issues such as the preservation of coral reefs, efforts to improve ocean water quality, and the

promotion of wastewater reuse on Maui. Over the past several years, members of the Sierra Club-Maui Group have presented testimony at public hearings and written letters and emails to local, state, and federal officials regarding the need to reduce nearshore pollution from the injection wells at the LWRF and to shift to greater reuse of wastewater from the facility.

17.     Plaintiff Surfrider Foundation, a non-profit environmental organization dedicated to the protection of waves, water and beaches, files this complaint by and through its Maui Chapter.  Surfrider Foundation-Maui Chapter has over 2,800 members, including Maui residents and people who visit Maui regularly.  Members of Surfrider Foundation-Maui Chapter use the nearshore waters along the West Maui coast, including, but not limited to, the Kahekili Beach area, for activities such as snorkeling, swimming, stand-up paddling, and SCUBA diving.  A healthy nearshore ocean environment and good water quality are essential for Surfrider Foundation-Maui Chapter members to participate in these activities.

18.     Over the past several years, members of the Surfrider Foundation-Maui Chapter have contributed testimony and participated in public hearings to promote greater wastewater reuse, reduce reliance on injection wells, and improve the treatment of injection wastewater at the LWRF to protect water quality on Maui.

19.    Plaintiff West Maui Preservation Association ("WMPA") is a Hawai'i non-profit corporation founded in 2004 that is dedicated to the preservation and protection of the natural and cultural environment of West Maui, including West Maui's ocean waters.

20.    WMPA's board members and volunteers regularly use the coastal areas of West Maui, including, but not limited to, the Kahekili Beach area, for such activities as swimming, SCUBA diving, snorkeling, walking and jogging along the beach, holding gatherings at the beach for birthday parties and various community celebrations, and other recreation. WMPA's ability to use and enjoy the marine waters along the West Maui coast depends on good water quality and a functioning nearshore ecosystem.

21.    WMPA has presented testimony at public hearings and meetings over the past several years regarding discharges from the injection wells at the LWRF and nearshore water quality issues in West Maui, including, but not limited to, the Kahekili Beach area.

22.    Defendant's operation of the injection wells at the LWRF in violation of the CWA and the resulting discharges of pollutants into ocean waters have adversely affected and continue to adversely affect the environmental, aesthetic, recreational, scientific, and educational interests of Hawai'i Wildlife Fund, Sierra Club-Maui Group, Surfrider Foundation and WMPA. Unless the relief requested herein is granted, plaintiffs will continue to be irreparably injured by defendant's

illegal discharges, as detailed below.  Plaintiffs bring this action on behalf of themselves and their adversely affected members.

B.    Defendant

23.    Defendant County of Maui is sued as the owner and operator of the LWRF.  Plaintiffs are informed and believe, and on the basis thereof allege, that, at all times that the violations alleged in this complaint have taken place and continue to take place, the County has owned, operated, and managed the LWRF.

24.    Defendant is a "municipality" as defined in CWA section 502(4), 33 U.S.C. § 1362(4), and, thus, is a "person" as defined in CWA section 502(5), id. § 1362(5).

STATUTORY BACKGROUND

**The Clean Water Act**

25.    In 1972, Congress enacted the Federal Water Pollution Control Act, known as the Clean Water Act, in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  To further this central goal, section 301(a) of the CWA prohibits "the discharge of any pollutant" into the nation's waters, except when specifically authorized under the CWA.  Id. § 1311(a).

26.    The CWA defines the term "pollutant" broadly to include "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions,

chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." Id. § 1362(6).

27.    The CWA specifies that "navigable waters" include "waters of the United States, including the territorial seas."   Id. § 1362(7).

28.    The CWA defines "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." Id. § 1362(14).

29.    Section 402(a) of the CWA, id. § 1342(a), authorizes the issuance of NPDES permits to allow point sources to discharge limited quantities of pollutants into surface waters, where appropriate.  The NPDES program is designed to protect the quality of surface waters.  Without an NPDES permit, a point source may not discharge to waters of the United States without being subject to enforcement action and fines.  Id. §§ 1311(a), 1319; 40 C.F.R. § 19.4.

30.    The discharge of pollutants into subsurface water with a hydrological connection to navigable waters is subject to the CWA, including the NPDES permitting requirements.

31.    CWA section 402(b), 33 U.S.C. § 1342(b), gives the EPA Administrator authority to allow a state to administer its own NPDES program.  In

the state of Hawai'i, the EPA has delegated authority to DOH to issue NPDES permits. Id.; 40 C.F.R. § 123.24. A state-issued NDPES permit can impose effluent limits and other provisions that are more stringent than the federal requirements for an NPDES permit, but all provisions must be at least as stringent as the federal requirements. 40 C.F.R. § 123.25(a); H.A.R. § 11-55-02(c).

32.   Federal or state agencies administering the NPDES program are required to ensure compliance with a variety of CWA provisions – including state water quality standards, which incorporate water body use classifications, water quality criteria, and anti-degradation requirements – and ultimately make a determination whether a discharge permit will be issued and, if so, the quantities of pollutants permitted in that discharge.

33.   The CWA requires that waters in each state be assigned use classifications that determine what type of uses a particular water body should be able to support. 40 C.F.R. § 131.10(a)-(b). Classifications of water bodies must take into account uses such as "recreation in and on the water" and "protection and propagation of fish, shellfish and wildlife," among others. Id. § 131.10(a). Administrative regulations determine the use classifications of water bodies in Hawai'i, including those for marine waters. H.A.R. §§ 11-54-2 (classification of state waters); 11-54-3 (classification of water uses).

34.   Due to their location within the Hawaiian Islands Humpback Whale National Marine Sanctuary ("the Sanctuary"), which was designated pursuant to

the National Marine Sanctuaries Act, 16 U.S.C. §§ 1431 et seq., the marine waters

along the West Maui coast near the LWRF are classified as marine class AA.

H.A.R. § 11-54-6(b)(2)(A)(x); see also 15 C.F.R. § 922.181.  Marine class AA

waters are required to support the following uses:  "oceanographic research, the

support and propagation of shellfish and other marine life, conservation of coral

reefs and wilderness areas, compatible recreation, and aesthetic enjoyment."

H.A.R. § 11-54-3(c)(1)(B).

   35.    Hawai'i regulations additionally classify waters according to "marine

bottom type," and the West Maui waters near the LWRF, including but not limited

to the Kahekili Beach area, are designated as marine bottom type "reef flats and

reef communities" and are further designated "class I" because they include reef

flats and reef communities located within the Sanctuary.  Id. § 11-54-7(e)(2)(A)(i).

The regulations state that "[n]o action shall be undertaken which would

substantially risk damage, impairment, or alteration of the biological characteristics

of the areas named herein."  Id. § 11-54-7(e)(3).

   36.    Along with establishing use classifications, states establish water

quality criteria designed to protect the designated uses assigned to a particular

body of water.  40 C.F.R. § 131.11(a).  The criteria can be either narrative, which

describe qualitative conditions, or numeric, which set quantitative limits for certain

pollutants.  Id. § 131.11(b).  In Hawai'i, narrative criteria require that, among other

things, "[a]ll waters shall be free of substances attributable to domestic, industrial,

or other controllable sources of pollutants" and free of conditions like turbidity and "deleterious substances at levels or in combinations sufficient to be toxic or harmful to human, animal, plant, or aquatic life, or in amounts sufficient to interfere with any beneficial use of the water . . . ." H.A.R. § 11-54-4(a)(4); see also id. §§ 11-54-4(a)(3), 11-54-4(a)(5), 11-54-4(b)(2).  Hawai'i has also established numeric criteria for a variety of toxic pollutants, and for non-toxic pollutants including, but not limited to, nitrogen, ammonia nitrogen, turbidity, phosphorous, and enterococcus bacteria. Id. §§ 11-54-4(b)(3); 11-54-6(b)(3); 11-54-8(b)(1)-(3) (specific enterococcus criteria for recreational areas).

37.     In addition to narrative and numeric criteria, "ocean discharge criteria" must be applied when establishing NPDES permit limits for discharges into the territorial sea or ocean.  33 U.S.C. § 1343(a).  Pursuant to federal regulations, the agency drafting an NPDES permit must determine "whether a discharge will cause unreasonable degradation of the marine environment" based on a number of factors, including "[t]he quantities, composition and potential for bioaccumulation or persistence of the pollutants to be discharged," "[t]he composition and vulnerability of the biological communities which may be exposed to such pollutants," and "[t]he existence of special aquatic sites including . . . marine sanctuaries and refuges . . . and coral reefs."  40 C.F.R. § 125.122(a)(1), (3), (5).  Agencies issuing NPDES permits for discharges into the ocean must ensure that any discharges will not unreasonably degrade the marine environment

or, in situations where the director does not have sufficient information to make that determination, must require that the permittee comply with specified permit conditions while the director gathers necessary information; otherwise, the permit cannot be issued.  Id. § 125.123(a)-(d).

38.     The CWA and implementing regulations also set forth minimum requirements for states to establish an anti-degradation policy, which is intended to protect waters from activities that could lower water quality.  Id. § 131.12(a). Hawai'i's anti-degradation regulations require that, at a minimum, "[e]xisting uses and the level of water quality necessary to protect the existing uses shall be maintained and protected."  H.A.R. § 11-54-1.1(a).

39.     In Hawai'i, "[no] person, including any public body, shall discharge any water pollutant into state waters, or cause or allow any water pollutant to enter state waters" except in compliance with the state's water pollution regulations. H.R.S. § 342D-50(a); see also H.A.R. § 11-55-03.   DOH has promulgated procedural requirements to apply for and obtain an NPDES permit in Hawai'i. H.A.R. §§ 11-55-04 to -15.   DOH is charged with assessing applications for NPDES permits and determining the limits in NPDES permits based on, among other things, the nature of the discharge from the facility and the state water quality standards in the receiving water body.  Id. § 11-55-15.  "It is the public policy of [the State of Hawai'i] . . . [t]o provide that no waste be discharged into any state

waters without first being given the degree of treatment necessary to protect the legitimate beneficial uses of the waters." Id. § 11-55-02(a)(3).

40.     DOH has established general NPDES permits, but only facilities that fall within one of the established general permit categories are allowed to claim coverage under a general permit. Id. § 11-55-34.02(b) (setting forth eleven categories of facilities that qualify for general NPDES permitting). All other facilities that discharge or propose to discharge must apply for an individual NPDES permit and must provide specific information about the facility and the discharge in the application. 40 C.F.R. § 122.21(a), (f), (j) (specific application requirements for new and existing publicly owned treatment works); H.A.R. § 11-55-04(a)-(c).   Under state law, a publicly owned treatment works facility, like the LWRF, does not fall within one of the designated categories for a general NPDES permit and must obtain an individual NPDES permit.

41.     Facilities proposing to discharge generally must submit an application for an NPDES permit at least 180 days prior to the date when the discharge is scheduled to commence. 40 C.F.R. § 122.21(c)(1); H.A.R. § 11-55-04(a)(1).

42.     In Hawaiʻi, state regulations create a mechanism for DOH to impose strict monitoring and reporting requirements on NPDES permittees to ensure compliance with the permit's discharge limits and conditions. H.A.R. §§ 11-55-28 to -31.

BACKGROUND FACTS

43.     At all relevant times, defendant has owned and operated the LWRF in Lahaina, Maui, Hawai'i.  The focus of defendant's activities at the LWRF is the treatment, partial reuse, and disposal of wastewater.  The LWRF currently uses four injection wells for the disposal of wastewater.  Plaintiffs allege on information and belief that the LWRF first began discharging wastewater into injection wells 1 and 2 in May 1982, began additional discharges into injection wells 3 and 4 in 1985, and has continued discharging into some or all of the four injection wells on a daily basis from 1985 up to the present.

44.     Plaintiffs allege on information and belief that defendant's wastewater activities at LWRF currently involve the injection of 3-5 million gallons of wastewater per day into some or all of the four injection wells.  This wastewater is discharged into groundwater through a subsurface pipe at the bottom of the individual injection wells, where it flows with the groundwater out to the ocean.

45.     Even before the LWRF began operating, the County was aware that injected wastewater would discharge into the ocean through groundwater.  The County acknowledged this fact in 1973 in hearings on the environmental impact statement for the LWRF project, before the facility or any of the injection wells were constructed.  The County has further acknowledged this since the LWRF began operating, including, but not limited to, in an environmental assessment the County prepared for a proposed LWRF expansion in 1991, which stated:

Effluent from the Lahaina Wastewater Reclamation
Facility currently is discharged via injection wells to
fractures in the underlying basalt. This effluent, via
gravity and the pressure from up-gradient groundwater,
flows toward the ocean. Treatment plant effluent
contributes various constituents, including but not limited
to, suspended solids, dissolved oxygen, and nutrients
such as nitrogen and phosphorous to the ocean.

46.     Two recent scientific studies, one conducted by the University of

Hawaiʻi at Mānoa ("UH study") and one conducted by the U.S. Geological Survey

("USGS study") in cooperation with DOH, have likewise concluded that effluent

from the LWRF is discharging pollutants into the ocean.

47.     To determine the presence of wastewater from the LWRF in nearshore

waters, researchers who conducted the UH study surveyed species of algae around

the entire coast of Maui in the summer of 2007 to examine the levels of $\delta^{15}N$ in

algal tissue. [1]   The surveys confirmed elevated $\delta^{15}N$ signatures in algae growing in

nearshore marine waters slightly to the south of the LWRF.

48.     As a result of the detection of high levels of $\delta^{15}N$ in the algae, starting

in January 2009 and continuing for a five-month period thereafter, the UH

researchers deployed algae samples in suspended plastic cages at thirty-two

---

[1] "$\delta^{15}N$" refers to a nitrogen isotope ratio that is used to distinguish nitrogen
derived from wastewater from nitrogen that is naturally-occurring or from
fertilizer. Naturally-occurring nitrogen and nitrogen from fertilizer have low $\delta^{15}N$
signatures, while wastewater has notably higher signatures, especially when the
facility handling the wastewater employs biological nitrogen removal, as the
LWRF does.

different sites in marine waters between the area directly offshore of the LWRF down to the southern edge of Kahekili Beach Park, ultimately taking 344 algae samples.[2] The goal was to determine the nitrogen ratios in the deployed samples to verify the uptake of wastewater-derived nitrogen from the LWRF.

49.    The study concluded that samples suspended over freshwater seeps discharging from the ocean floor offshore of Kahekili Beach "drastically" increased in $\delta^{15}N$ signature over the sampling period and additionally found that there were significant increases in $\delta^{15}N$ signatures at the sampling sites nearest to shore, demonstrating the presence of nitrogen from wastewater originating at the LWRF. The $\delta^{15}N$ values in the algae samples suspended over the freshwater seeps are the highest ever reported in the world.

50.    The UH researchers observed nuisance algal blooms at and around many of the sampling sites offshore of Kahekili Beach and, based on the spatial distribution of the sampling locations and the analysis of the $\delta^{15}N$ content in the algae, concluded that "the injected effluent from the [LWRF] is continuously flowing through the reef at Kahekili and then subsequently flows to the south."

51.    Like the UH study, the USGS study evaluated whether wastewater from the LWRF is present in the nearshore waters of the Kahekili Beach Park area.

---

[2] The researchers used *Ulva fasciata* for the sampling, a type of algae the researchers had observed forming nuisance algal blooms underwater in the Kahekili Beach area.

It found that "[m]unicipal wastewater injection plumes were successfully detected in the ocean by nearshore wading surveys at . . . Lahaina, Maui."

52.     The USGS study sampled for several wastewater tracers – including the pharmaceuticals carbamazepine and sulfamethoxazole, tribromomethane, two musk fragrances, a fire retardant, and a plasticizer compound –  and found that they persisted through the waste treatment process at the LWRF, migrated through the subsurface aquifer after injection, and were discharged into marine waters offshore of Kahekili Beach Park.  The USGS study tested for "multiple inherent wastewater tracers" to ensure that the results it obtained were conclusive evidence of the presence of LWRF wastewater in nearshore waters.

53.     Like the UH study, the USGS study found elevated levels of $\delta^{15}N$ in algae sampled in the same area, which provided further evidence of the presence of LWRF wastewater.  Water samples taken during the course of the USGS study confirmed that "the effluent plume[] [from the LWRF] constitute[s] large nutrient fluxes to the nearshore environment" in the form of nitrogen and phosphorous.

54.     The illegal discharges of pollutants from the LWRF's injection wells have deteriorated nearshore ocean water quality and harmed the fragile ecosystem. Excess input of nutrients like nitrogen and phosphorus accelerate the growth of *Hypnea musciformis, Acanthophora spicifera,* and *Ulva fasciata*, nuisance algae that form harmful blooms in West Maui marine waters, including those in the Kahekili Beach area.

19

55.    The detrimental effects of nuisance algal growth on coral reefs in West Maui are well-documented.  Algae can smother reefs by growing in dense thickets on top of them, blocking coral photosynthesis and impeding the growth of new corals by preventing settlement of coral larvae on the reef.  Algae can also serve as hosts to harmful microbial pathogens that cause coral illness and death.  By increasing the survival and dispersal of nuisance algae, nutrient inputs from the LWRF have contributed to the dramatic decline in coral reef cover in the Kahekili Beach area, harming the area's ecosystem.

56.    The Hawai'i Department of Land and Natural Resources, Division of Aquatic Resources ("DAR") has voiced "very serious concerns" about the effects of wastewater injection at the LWRF on the health of coral reefs in the area.  In a 2008 letter to the EPA, DAR highlighted the clear correlation "between wastewater injection [at the LWRF], decreasing coral reef cover, and increased problems with invasive algae" in the waters offshore of Kahekili Beach Park, noting:

> evidence we have collected . . . indicates reefs
> immediately offshore of the LWRF are experiencing
> substantial degradation.  Over a little more than a decade,
> nearly half of the coral cover on [the reefs offshore of
> Kahekili Beach] has disappeared . . . Along with the
> evidence of coral reef declines, we are also finding
> periodic problems with invasive algal blooms, and
> increased bio-erosion from filter feeding invertebrates.
> All of these factors suggest that this reef is being
> impacted by chronic exposure to elevated nutrients . . .
> recent scientific studies have provided evidence that the
> injection well plumes are percolating up into the near-
> shore waters where the reef degradation is occurring.

57.    The EPA recently stated that "[i]nformation . . . indicates that the effluent plume [from the LWRF] travels with ground water to the coastal water and contributes to nitrogen loading in the near coastal environment." The EPA additionally noted that "[e]vidence has shown that nitrogen is a nutrient for algae growth in the coral reef environment and can be detrimental to the near coastal environment."

58.    In late July 2011, EPA began conducting a tracer dye study at the injection wells to obtain further information about the path that wastewater and other pollutants injected at the LWRF take to the ocean. Large quantities of tracer dye were injected into the wells at the LWRF, and researchers from EPA and UH began monitoring the nearshore waters, including the freshwater seeps, offshore of Kahekili Beach for dye. In late October 2011, the researchers began detecting dye flowing from freshwater seeps in the ocean floor offshore of Kahekili Beach, with dramatically increasing amounts of dye detected through the time this complaint was filed. The dye study further confirms the ongoing hydrological connection between the LWRF's injection wells and the ocean.

59.    As discussed above, West Maui's ocean waters, including the waters offshore of Kahekili Beach Park, are part of the Hawaiian Islands Humpback Whale National Marine Sanctuary designated by the National Marine Sanctuaries Act. The Sanctuary was designated to protect humpback whales and their habitat,

which necessitates maintaining a healthy marine ecosystem and good water quality within the Sanctuary.  15 C.F.R. §§ 922.180(a), 922.184(a)(5).

60.    Due to their location within the Sanctuary, the ocean waters offshore of the LWRF are designated by DOH as marine class AA waters, with protected uses including "oceanographic research, the support and propagation of shellfish and other marine life, conservation of coral reefs and wilderness areas, compatible recreation, and aesthetic enjoyment."  H.A.R. § 11-54-3(c)(1)(B).  The submerged lands offshore of the LWRF are classified as marine bottom type "reef flats and reef communities" and are designated as class I, also because they are located within the Sanctuary.  Id. § 11-54-7(e)(2)(A)(i).  The discharge of pollutants from the LWRF into these waters without an NPDES permit harms these protected uses.

61.    Despite knowing for decades that the LWRF's injection wells discharge to nearshore West Maui waters and mounting scientific evidence of the harm those discharges cause to fragile marine ecosystems, the County has never applied for, much less obtained and complied with, an NPDES permit to control its illegal discharges.  Instead, the County continues to pass off the environmental and social costs of the discharges to the public.

62.    These fragile marine waters and coral reefs, including, but not limited to, those in the Kahekili Beach area, will continue to be degraded by the continuous discharges from the LWRF's injection wells unless and until the

County is compelled to secure, and comply with the terms of, an NPDES permit, as required by the Clean Water Act.

## FIRST CLAIM FOR RELIEF

### (Discharges Without An NPDES Permit)

63.     Plaintiffs reallege and incorporate by reference each and every allegation contained in paragraphs 1 through 62 of this complaint.

64.     Defendant has violated and is violating section 301(a) of the CWA, 33 U.S.C. § 1311(a), and H.R.S. § 342D-50(a), which prohibit discharges of pollutants without an NPDES permit, by allowing continuous discharges of wastewater and other pollutants from its injection wells at the LWRF through hydrologically connected groundwater into waters of the United States. Defendant is subject to civil penalties under the CWA section 309(d), 33 U.S.C. § 1319(d), of up to $32,500 per day for each violation occurring through January 12, 2009, and $37,500 per day for every violation occurring thereafter. 40 C.F.R. § 19.4, tbl. 1.

65.     Defendant's violations of the above-listed statutes began prior to 2006, and continue up to the present. These violations will continue until defendant obtains and complies with an NPDES permit for its discharges. 33 U.S.C. §1311(a); id. § 1342.

## SECOND CLAIM FOR RELIEF

### (Failure To Obtain And Comply With The Terms Of An NPDES Permit

Prior To Discharging To Surface Waters From The LWRF's Injection Wells)

66.     Plaintiffs reallege and incorporate by reference each and every allegation contained in paragraphs 1 through 65 of this complaint.

67.     Defendant has violated and is violating the CWA section 402, 33 U.S.C. § 1342, and implementing federal and state regulations, 40 C.F.R. § 122.21(c)(1) and H.A.R. § 11-55-04(a)(1), by commencing discharges of wastewater and other pollutants from its injection wells at the LWRF through hydrologically connected groundwater into waters of the United States without first obtaining and complying with the terms of an NPDES permit at least 180 days prior to the first discharge.  Defendant is subject to civil penalties under CWA section 309(d), 33 U.S.C. § 1319(d), of up to $32,500 per day for each violation occurring through January 12, 2009, and $37,500 per day for every violation occurring thereafter.  40 C.F.R. § 19.4, tbl. 1.

68.     Defendant's violations of the requirements set forth in the preceding paragraph began one hundred eighty (180) days prior to the first discharge, and continue up to the present.  These violations will continue unless and until defendant obtains and complies with the terms of an NPDES permit.  33 U.S.C. §1311(a); id. § 1342.

PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that the Court:

1.     Enter a declaratory judgment that defendant has violated and is violating the CWA by discharging wastewater and other pollutants from its injection wells at the LWRF through hydrologically connected groundwater into waters of the United States in the absence of an NPDES permit;

2.     Enter a declaratory judgment that defendant has violated and is violating the CWA by commencing discharges of wastewater and other pollutants from its injection wells at the LWRF through hydrologically connected groundwater into waters of the United States without first obtaining and complying with the terms of an NPDES permit at least 180 days prior to the first discharge;

3.     Issue appropriate injunctive relief requiring defendant immediately to apply for and comply with the terms of an NPDES permit for the injection wells at the LWRF to prevent further illegal discharges of pollutants;

4.     Impose civil penalties for defendant's illegal, unpermitted discharges from the injection wells at the LWRF in the amount of $32,500 per day for each violation occurring through January 12, 2009, and $37,500 per day for every violation occurring thereafter, through the date of judgment herein, pursuant to 33 U.S.C. § 1319(d) and 40 C.F.R. § 19.4, tbl. 1;

5.     Impose civil penalties for defendant's failure to obtain and comply with the terms of an NPDES permit at least 180 days prior to the commencement of discharges of pollutants into marine waters from the injection wells at the LWRF in the amount of $32,500 per day for each violation occurring through

January 12, 2009 and $37,500 per day for every violation occurring thereafter, through the date of judgment herein, pursuant to 33 U.S.C. § 1319(d) and 40 C.F.R. § 19.4, tbl. 1;

6.     Retain continuing jurisdiction to review defendant's compliance with all judgments entered herein;

7.     Issue such additional judicial determinations and orders that are necessary to effectuate the foregoing requests for relief;

8.     Award plaintiffs the costs of this litigation, including reasonable attorney and expert witness fees, pursuant to CWA section 505(d), 33 U.S.C. § 1365(d); and

9.     Issue such other and further relief as the Court deems just and appropriate.

DATED:  Honolulu, Hawai'i, April 16, 2012.

EARTHJUSTICE
David L. Henkin
Caroline C. Ishida
223 S. King Street, Suite 400
Honolulu, Hawai'i  96813

By:   CAROLINE C. ISHIDA
      Attorneys for Plaintiffs