IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| HAWAI`I WILDLIFE FUND, a Hawaii non-profit corporation; SIERRA CLUB-MAUI GROUP, a non-profit corporation; SURFRIDER FOUNDATION, a non-profit corporation; and WEST MAUI PRESERVATION ASSOCIATION, a Hawaii non-profit corporation, ) ) ) ) ) ) ) ) ) ) ) | CIVIL NO. 12-00198 SOM/BMK ORDER DENYING DEFENDANT'S MOTION FOR STAY AND GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT |
|          Plaintiffs, ) ) | |
|     vs. ) ) | |
| COUNTY OF MAUI, ) ) | |
|         Defendant. ) _____ ) | |

**ORDER DENYING DEFENDANT'S MOTION FOR STAY AND
GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

I.        **INTRODUCTION.**

Plaintiffs Hawaii Wildlife Fund, Sierra Club, Surfrider Foundation, and West Maui Preservation Association move for partial summary judgment against Defendant County of Maui, arguing that the undisputed evidence demonstrates that the County has violated the Clean Water Act by discharging effluent, without a National Pollutant Discharge Elimination System ("NPDES") permit, at four injection wells at the Lahaina Wastewater Reclamation Facility ("LWRF"). Plaintiffs contend that the wastewater eventually finds its way into the ocean on Maui's west shore.

The County brings its own motion, arguing that, given the County's application for an NPDES permit, the court should dismiss or stay this case to give Hawaii's Department of Health and the Environmental Protection Agency an opportunity to consider the need for a permit in the first instance.

The County concedes, and the undisputed evidence shows, that pollutant discharged at the two largest wells at the LWRF is migrating into the ocean. The court has not been given any firm date for a final decision on the County's NPDES permit application. The court therefore denies the County's motion for

stay or dismissal and grants Plaintiffs' motion for partial summary judgment.

## II.        BACKGROUND.

The County of Maui operates the LWRF, a wastewater treatment facility approximately three miles north of the town of Lahaina on the island of Maui.  See Tracer Dye Study Final Report at ES-21, ECF No. 73-10.  The facility receives approximately four million gallons per day of sewage from a collection system serving approximately 40,000 people.  The facility filters and disinfects the sewage, then releases the treated effluent (sometimes called "reclaimed water" or "wastewater") into four on-site injections wells.  Id.  The injection wells are long pipes into which effluent is pumped.  The effluent then travels approximately 200 feet underground into a shallow groundwater aquifer beneath the facility.  See 1993 Injection Well Report, ECF No. 73-21.  While "the precise depth of this aquifer fluctuates somewhat, depending on water inputs and other conditions," it contains "a sufficient quantity of ground water to supply a public water system."  UIC Consent Decree at 28-29, ECF No. 73-24.  The LWRF typically discharges three to five million gallons of effluent into the four injection wells on a daily basis.  See Tracer Dye Study Final Report at 1-16. Approximately 80% of the effluent is discharged from wells 3 and 4.  Id. at ES-21.

It is undisputed that effluent pumped into injection wells 3 and 4 eventually finds its way to the Pacific Ocean, emerging through "submarine springs" in the waters off Kahekili Beach on Maui's west shore.  Id. at ES-2, 3.  This finding was the conclusion of a study conducted jointly by the EPA, the Hawaii Department of Health ("DOH"), the U.S. Army Engineer Research and Development Center, and researchers at the University of Hawaii.  The study involved placing tracer dye into each of the LWRF injection wells and monitoring the submarine seeps off Kahekili Beach to see if and when the dye would flow into the ocean.  Id.  Dye from wells 1 and 2 did not emerge at the seeps, but the dye introduced into wells 3 and 4 was detected eighty-four days after being placed in the wells.  Id.  The study concluded that the presence of the dye "conclusively demonstrate[s] that a hydrogeologic connection exists between LWRF Injection Wells 3 and 4 and the nearby coastal waters of West Maui."  Id. at ES3.  The study further estimated that "64% of the dye injected into Wells 3 and 4 will [eventually be] discharged at the submarine spring areas."  Id.  As a result of that finding, the report also concluded that "64% of the treated wastewater injected into [the] wells currently discharges from the submarine spring areas" and into the ocean.  Id.

The County appears to have been aware for some time of the hydrologic connection between the aquifer under the LWRF and

the ocean.  A 1991 environmental assessment, conducted by the
County's Department of Public Works, noted that treated effluent-
-including suspended solids, dissolved oxygen, nitrogen, and
phosphorous--flows from the injection wells into the ocean.  See
LWRF Environmental Assessment, ECF No. 73-33.

In 2007, the University of Hawaii at Manoa conducted a
study that showed an elevated level of a nitrogen isotope in
algae growing in nearshore waters south of the LWRF.  See
Declaration of Jennifer E. Smith ¶ 8-9, ECF No. 72-2.  The study
concluded that the nitrogen came from the LWRF.  Id.  The United
States Geological Survey also did a study that found "wastewater
presence" in the ocean and elevated levels of a nitrogen isotope
in ocean water samples.  See A Multitracer Approach to Detecting
Wastewater Plumes from Municipal Injection Wells in Nearshore
Marine Waters at Kihei and Lahaina, ECF No. 73-13.

In 2010, the EPA responded to the County's request to
renew its Underground Injection Control ("UIC") permit for the
LWRF by informing the County that recent studies "strongly
suggest that effluent from the facility's injection wells is
discharging into the near shore coastal zone of the Pacific
Ocean."  EPA Letter, ECF No. 73-34.

Plaintiffs' experts contend that the water emerging
from the submarine seeps near Kahekili beach is significantly
affecting the chemical, physical, and biological integrity of the

nearshore water.  See generally Declaration of Adina Paytan, ECF

No. 73-1; Smith Decl.  In particular, Plaintiffs' experts

conclude that the water near the seeps has elevated levels of

inorganic nitrogen and phosphorus, low salinity, low pH, and high

temperature.  See Paytan Decl. ¶¶ 5, 23-36; Smith Decl. ¶¶ 13-40.

The County's experts admit that the water *directly* above the

seeps bears this properties, but argues that when the water mixes

with ocean water these effects rapidly diminish.  Declaration of

Steven Dollar ¶¶ 9-14, ECF No. 79-2; Declaration of Susan C.

Paulsen ¶¶ 19, 21-23, ECF No. 79-3.  The County's experts

conclude that the effect on nearshore water is not significant.

Id.

     Plaintiffs argue that the impact of the effluent on

Kahekili's nearshore waters is "more than theoretical."  Smith

Decl. ¶ 22.  Plaintiffs' experts state that, because of the

additional nitrogen and phosphorus, the coral reefs at Kahekili

have been repeatedly subjected to algal blooms, which have

contributed to a dramatic decline in coral cover.  Id. ¶ 13.

Plaintiffs' experts also say that the effluent flowing into the

ocean has substantially lower pH levels and oxygen concentration

than the receiving water.  Smith Decl. ¶¶ 29, 35; Paytan Decl.

¶¶ 31, 34.  The low pH, Plaintiffs' experts say, is causing some

species of reef-building corals and coralline algae to dissolve

and die, and the low level of oxygen is suffocating coral,
leading to loss of coral tissue and coral death.  Smith Decl.
¶¶ 30, 34.  In addition, Plaintiffs experts say that the effluent
has lower salinity and higher temperature than the receiving
water, properties that can also endanger and kill coral.  See
Paytan Decl. ¶¶ 25-29, 34; Smith Decl. ¶¶ 31-33, 37-38.

The County's expert argues, on the other hand, that
visual inspection of the coral reveals that "all reef areas
appeared essentially pristine," and that he "observed [no]
bleached, diseased, or otherwise stressed corals."  Dollar Decl.
¶ 44.  The County points to photographs of the reef close to the
seeps, which appear to have healthy coral.  Defendants' Exhs. 6
to 11, ECF Nos. 79-9, 79-10, 79-11, 79-12, 79-13 and 79-14.

In August 2001, the County of Maui and the EPA entered
into a consent decree regarding the injection wells and
compliance with the Safe Drinking Water Act, 42 U.S.C.
§§ 300h-2(c), 200j-4(a).  See ECF No. 8-3.  This consent decree
did not discuss whether an NPDES permit was needed for the
injection wells under the Clean Water Act, although it required
the County to obtain a water quality certification under section
401 of the Clean Water Act, 33 U.S.C. § 1341, from the State of
Hawaii.  The County has applied for that certification, but, as
of March 6, 2014, not even a preliminary determination had been

made as to whether the County will receive such certification. See DOH letter dated March 6, 2014, ECF No. 71-4.

The County has also applied for an NPDES permit. Id. Despite maintaining that such a permit is not required, the County submitted its application for the permit to the State's DOH on November 14, 2012, which was after this lawsuit was filed. The application was forwarded to the EPA on November 20, 2012. Id. As of March 6, 2014, the DOH had "not made a tentative or preliminary determination" on the application, nor received any comments from EPA. Id. However, after the hearing on the present motions, the County received a draft permit and was invited to comment on the draft by June 9, 2014. See ECF No. 106. The DOH says that, after receiving comments from Plaintiffs' counsel, the County, and the EPA, it will revise the draft permit if appropriate and proceed to notice and a thirty-day public comment period and public hearing. Depending on the public comments it receives, DOH intends to issue a final permit within a few months thereafter. Id.

Plaintiffs contend that the County's continued discharge of wastewater without an NPDES permit violates the Clean Water Act.

The Clean Water Act, passed in 1972, was intended by Congress "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C.

§ 1251(a).  To further that objective, the Clean Water Act prohibits the "discharge of any pollutant" unless certain provisions of the Clean Water Act are complied with.  See 33 U.S.C. § 1311(a).  The Clean Water Act defines "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12).  In relevant part, the Clean Water Act defines "pollutant" as "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water."  33 U.S.C. § 1362(6).  The Clean Water Act defines "navigable waters" as "the waters of the United States, including the territorial seas."  33 U.S.C. § 1362(7).  The Clean Water Act defines "point source" as

> any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged.  This term does not include agricultural stormwater discharges and return flows from irrigated agriculture.

33 U.S.C. § 1362(14).  The Clean Water Act allows discharges of pollutants when an NPDES permit is obtained and complied with. See 33 U.S.C. § 1342.

The Clean Water Act is enforced by state and federal authorities working together.  Under the Act, a state may apply for a transfer of permitting authority to state officials.  <u>See</u> 33 U.S.C. § 1342.  Hawaii obtained permitting authority in 1974. 48 F.R. 15662-01.  Once "authority is transferred, then state officials—not the federal EPA—have the primary responsibility for reviewing and approving NPDES discharge permits, albeit with continuing EPA oversight."  <u>Nat'l Ass'n of Home Builders v. Defenders of Wildlife</u>, 551 U.S. 644, 650 (2007).  The state must advise the EPA of each permit it proposes to issue, and the EPA may object to any permit. 33 U.S.C. §§ 1342(d)(1), (2).  If the state does not adequately address EPA's concerns, authority over the permit reverts to the EPA.  <u>Id.</u> § 1342(d)(4).

Plaintiffs sued the County, seeking to compel it to apply for and comply with the terms of an NPDES permit, and to pay civil penalties for its earlier allegedly unlawful discharge. The County moved to dismiss on various grounds.  Among other things, the County contended that the court should defer acting until the DOH and the EPA had first reviewed what was then only a future NPDES permit application.  On August 08, 2012, this court denied the County's motion to dismiss.  <u>See</u> ECF No. 34.  As noted above, subsequent to that dismissal, the County applied for an NPDES permit.  It now renews its argument that this action should be dismissed or stayed until the DOH and the EPA have ruled on

10

the permit application.  The County also moves to strike several
of the declarations introduced into evidence by Plaintiffs,
including portions of the declarations of experts Jennifer Smith
and Adina Paytan, and asks this court to take judicial notice of
several documents.

Plaintiffs move for summary judgment, arguing that, in
light of the findings of the tracer study, the undisputed
evidence demonstrates that the County has violated the Clean
Water Act.

**III.      ANALYSIS**

**A.    Requests that the Court Strike Evidence and Take
Judicial Notice.**

Recognizing that the County's motion to strike evidence
may bear on the contents of the record that the court will
consult to resolve the parties' substantive motions, the court
addresses that motion first.

The County first challenges the declarations of Hannah
Bernard, Lauren Campbell, Antoinette Lucienne de Naie, Sharyn
Matin, and Gary Savage, all of whom are representatives of the
various organizations bringing suit.  The County argues that
certain statements in these declarations constitute hearsay
and/or impermissible legal or scientific opinion that the
declarants are not qualified to give.  Plaintiffs respond that
all of these declarations simply support the various Plaintiff
organizations' standing, and that none of the opinions is

intended to bear on the question of the County's liability.   The
County has not challenged any Plaintiff's standing.   There is
therefore no reason to strike the declarations.

More significantly, the County challenges the
declarations of both of Plaintiffs' experts, Adina Paytan and
Jennifer Smith.

First, the County argues that Paytan's only
qualification is in chemical oceanography and that she therefore
has no expertise regarding the effects of the ocean's chemistry
on marine biology and on coastal ecosystems.   Plaintiffs
introduce a supplementary declaration by Paytan, which notes that
chemical oceanography is an interdisciplinary field that includes
the study of the effects of the ocean's chemistry on marine
biology, and that Paytan runs a biogeochemistry laboratory at the
University of California, Santa Cruz.   Paytan Opp. Decl. ¶¶ 2, 3,
ECF No. 92-1.   According to the declaration, biogeochemists study
how chemical cycles affect biological activity, and the research
Paytan has directly conducted or overseen at the laboratory has
been published in numerous peer-reviewed journals that focus on
biogeochemistry and marine biology, including peer-reviewed
articles specifically addressing effects on coral reefs.   Id.
The County's argument appears largely dependent on Paytan's own
characterization of herself as qualified in "chemical

oceanography" and the County's assertion that such a
qualification is inadequate.

The County has not asked for an evidentiary hearing
under Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589
(1993), regarding Paytan's alleged lack of expert qualification.
The assertions in the County's motion do not, without more,
establish that Paytan is not qualified as an expert.  This court
therefore declines to strike any part of her statements.

Second, the County challenges statements made by both
Paytan and Smith regarding the theoretical effects of elevated
levels of nitrogen, phosphorus, and oxygen on marine life.  The
County describes Paytan and Smith's testimony as "speculation"
and therefore inadmissible.  However, the theoretical contentions
made by both Smith and Paytan are not speculative.  Rather, they
appear to be based on "the expert[s'] scientific, technical, or
other specialized knowledge."  Fed. R. Evid. 702.  The
declarations directly relate to the potential effects effluent
may have on ocean water, and therefore go to whether there is a
significant nexus between the aquifer and the ocean.  Even if
such statements were insufficient to establish such a nexus in
themselves, the County does not show that they are either
irrelevant or prejudicial with respect to the matters that are to
be decided on the present motions.

Third, the County objects to the term "wastewater," used in both the Paytan and Smith declarations and in a declaration submitted by Plaintiffs' attorney, David Henkin. The County believes the material discharged from the LWRF should be described as "reclaimed water" or "effluent." "Wastewater" is a term that has been used throughout this litigation to refer to treated sewage that emerges from the LWRF and is the term used by the independently produced Tracer Dye Study. It is also what the "W" stands for in "LWRF," the acronym the County itself uses to describe the Lahaina facility. The court understands that the treatment of sewage at LWRF may eliminate various toxins from the water, and even make it safe for drinking. Whether this treated water is referred to as "wastewater," "effluent," or "reclaimed water" has no bearing on any of the County's arguments. The court understands the terms being used, and there is no prejudice to any party flowing from the use of the term "wastewater."

Finally, with regard to Plaintiffs' experts, the County objects that Smith's algal bloom study--Smith Decl. ¶ 9--is prejudicial because it analyzes the impact of water taken directly from the LWRF, without taking into account the diffusion and mixing that the effluent undergoes as it travels through groundwater and ocean water. The court recognizes that Smith's study does not account for these diffusion and mixing effects, but nevertheless finds the study's analysis probative as to the

potential effect that effluent has on marine life.  This is a
matter going to the weight of the evidence, not its
admissibility.  Defendant was free to seek its own analysis or
expert testimony showing that the diffusive effects of the
effluent's journey undermine Smith's analysis.  The impact of the
alleged diffusion is a matter in dispute between the experts, not
a reason to strike one side's expert testimony.

The County also challenges parts of the declaration of
David Henkin.  The County argues that various statements
describing data in the Henkin declaration should be stricken
because Henkin is not an expert.  The County asks that the court
consider the data without his interpretation.  Henkin's
statements do no more than point to other evidence in the record,
but, in any event, the court does not rely on the Henkin
declaration in interpreting any study in the record.  The County
further suggests that it is incorrect for Henkin to call the LWRF
discharges "unpermitted" because the County held various permits
other than a NPDES permit.  There is no prejudice caused by the
use of the word "unpermitted," which the court construes as
referring specifically to an NPDES permit and not all permits.
Finally, Plaintiffs admit that the Henkin declaration's
description of Defendant's NPDES application as "incomplete" is
better suited to a legal brief than a declaration.  The court

does not rely on this statement in paragraph 29 of Henkin's declaration.

For the reasons stated above, this court denies the County's motion to strike evidence. Plaintiffs do not oppose either of the County's two requests for judicial notice. ECF Nos. 80, 89. Those requests are therefore granted.

**B. Primary Jurisdiction.**

The Ninth Circuit has stated that a defendant must obtain an NPDES permit when it "(1) discharge[s] (2) a pollutant (3) to navigable waters (4) from a point source." Headwaters, Inc. v. Talent Irrigation Dist., 243 F.3d 526, 532 (9th Cir. 2001). It is not disputed that the effluent being discharged at the LWRF constitutes a pollutant that is being discharged from a point source. The only area of dispute between the parties is whether the discharge into the aquifer beneath the facility constitutes a discharge into "navigable waters."

The County argues that for the aquifer itself to be considered "navigable water" under the Clean Water Act, it must have both "a direct and immediate hydrological connection" to the ocean and "significantly affect the chemical, physical, and biological integrity" of the ocean waters. The County argues that this is a fact-sensitive inquiry best left to the DOH and the EPA.

The County therefore moves for judgment on the pleadings, or, in the alternative, for a stay, asking this court to rule that the DOH and the EPA have primary jurisdiction to decide whether the County requires an NPDES permit to discharge effluent at the Lahaina facility. Even if this court were to conclude that the agencies have primary jurisdiction, the court would not enter judgment on the pleadings in the County's favor.

"The rule in this Circuit is that where a court suspends proceedings in order to give preliminary deference to an independent adjudicating body . . . jurisdiction should be retained by a stay of proceedings, not relinquished by a dismissal." United States v. Henri, 828 F.2d 526, 528 (9th Cir. 1987) (internal quotation omitted). Therefore, the court denies the County's motion for judgment on the pleadings and considers only its request for a stay.

The doctrine of primary jurisdiction "is a prudential doctrine under which courts may, under appropriate circumstances, determine that the initial decisionmaking responsibility should be performed by the relevant agency rather than the courts." Syntek Semiconductor Co., Ltd. v. Microchip Tech. Inc., 307 F.3d 775, 780 (9th Cir. 2002). Primary jurisdiction "is not a doctrine that implicates the subject matter jurisdiction of the federal courts," and it is left "to the sound discretion of the

court" whether to stay a case pending resolution of an agency proceeding.  Id. at 780-81.

No fixed formula exists for applying the [primary jurisdiction] doctrine." Davel Commc'ns, Inc. v. Qwest Corp., 460 F.3d 1075, 1086 (9th Cir. 2006) (internal quotation marks and citation omitted).  However, the Ninth Circuit has stated that the doctrine "should be used 'if a claim requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency, and if protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme.'" Lyon v. Gila River Indian Cmty., 626 F.3d 1059, 1075 (9th Cir. 2010) (quoting Clark v. Time Warner Cable, 523 F.3d 1110, 1115 (9th Cir. 2008)).

The County argues that the primary objective of this lawsuit is to compel the County to apply for an NPDES permit, and that, because that application has been made, this court should allow the DOH and the EPA to decide whether a permit is required. The County further contends that this case involves "highly technical fact-specific inquiries" that require "the specialized expertise typically possessed by the agencies."  Memo. in Support of Primary Jurisdiction Motion at 10-11, ECF No. 71-1.

The decision as to whether the County requires an NPDES permit is certainly within the jurisdiction and competence of the

DOH and the EPA.  However, "while competence of an agency to pass on an issue is a necessary condition to the application of the [primary jurisdiction] doctrine, competence alone is not sufficient."  United States v. Culliton, 328 F.3d 1074, 1082 (9th Cir. 2003) (internal quotation marks omitted).  Given the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them," Colorado River Water Conservation District v. United States, 424 U.S. 800, 817–18 (1976), the primary jurisdiction doctrine should not be invoked unless "it would be inconsistent with the statutory scheme to deny the agency's power to resolve the issues in question."  Culliton, 328 F.3d at 1082.  See also Golden Hill Paugussett Tribe of Indians v. Weicker, 39 F.3d 51, 59 (2d Cir. 1994) ("Whether there should be judicial forbearance hinges . . . on the authority Congress delegated to the agency in the legislative scheme.").

It would not be inconsistent with the Clean Water Act's legislative scheme for this court to decide the question of whether the County requires an NPDES permit for its discharge at the LWRF.  The citizen suit provision in the Clean Water Act was specifically designed to allow courts to ensure direct compliance with the Act's requirements.  The presence of the citizen suit provision demonstrates that Congress believed courts were competent to make fact-sensitive determinations over whether a

particular discharge requires a permit.  Congress could easily
have committed that judgment to the sole discretion of an agency,
or, at the very least, limited citizen suits to situations in
which an agency had taken no action.  Congress did not do that.

The Clean Water Act contains other express limitations
on citizen suits.  For example, it bars suits undertaken prior to
the giving of notice to the agency and suits initiated during the
pendency of any government-initiated court action.  See 33 U.S.C.
§ 1365(b).  The absence of any textual limitation on citizen
suits initiated during agency review is a strong indication that
Congress intended such suits to proceed.  See Apalachicola
Riverkeeper v. Taylor Energy Co., LLC, 954 F. Supp. 2d 448, 460
(E.D. La. 2013) ("If Congress had intended for the primary
jurisdiction doctrine to bar citizen suits, it would have
included the doctrine among the specifically delineated
circumstances under which citizen suits are barred.").  See also
Ass'n to Protect Hammersley, Eld, & Totten Inlets v. Taylor Res.,
Inc., 299 F.3d 1007, 1012 (9th Cir. 2002) (allowing citizen suit
despite prior agency determination of no NPDES permit
requirement, because "Congress [has] empowered citizens to pursue
enforcement of the Clean Water Act when all procedural
requirements [are] satisfied").

Moreover, courts are plainly competent to address the
types of questions raised by the present citizen suit, such as

whether there is a hydrologic connection and significant nexus between two bodies of water.  Indeed, those are precisely the types of determinations that the Supreme Court made in <u>Rapanos v. United States</u>, 547 U.S. 715 (2006), and that the Ninth Circuit made in <u>Northern California River Watch v. City of Healdsburg</u>, 496 F.3d 993 (9th Cir. 2007).  The very existence of the citizen suit provision in the Clean Water Act indicates that Congress expected courts to make such judgments.

The County's references to <u>Montgomery Environmental Coalition Citizens Coordinating Committee of Friendship Heights v. Washington Suburban Sanitary Commission</u>, 607 F.2d 378 (D.C. Cir. 1979), and <u>Friends of Santa Fe County v. LAC Minerals, Inc.</u>, 892 F. Supp. 1333 (D.N.M. 1995), are unpersuasive.  Those cases "concerned the contents of a NPDES permit . . . and not whether a permit should be issued in the first place."  <u>Nat'l Wildlife Fed'n v. Consumers Power Co.</u>, 657 F. Supp. 989, 1001 (W.D. Mich. 1987), <u>rev'd on other grounds</u>, 862 F.2d 580 (6th Cir. 1988). Here, by contrast, "[r]esolution of plaintiffs' claim[s] does not require the court to set effluent standards or to write a permit for the defendant."  <u>Sierra Club v. El Paso Gold Mines, Inc.</u>, 198 F. Supp. 2d 1265, 1271 (D. Colo. 2002), <u>rev'd on other grounds</u>, 421 F.3d 1133 (10th Cir. 2005).  Instead, all that is required of this court is a determination as to whether the County is discharging a pollutant from a point source into the navigable

waters of the United States.  Such a judgment is within the
conventional expertise of courts and does not require the type of
complex technical judgment at issue in <u>Montgomery</u> and <u>LAC</u>
<u>Minerals</u>.

The County argues, "Given that the administrative
process is underway, an agency decision may make a court order
moot, or, should this litigation proceed, a court order could
subject the County to conflicting obligations."  Memo. in Support
of Primary Jurisdiction Motion at 17.  However, even if the DOH
and the EPA were to render a decision during the pendency of this
suit, or shortly afterwards, that would neither make the case
moot nor create conflicting obligations.  "[A] court may, in
entertaining a citizen suit, decide whether a discharge of
particular matter into navigable waters violates the CWA even
though the regulating agency determined that the discharge was
not subject to the requirement of a permit."  <u>San Francisco</u>
<u>Baykeeper v. Cargill Salt Div.</u>, 481 F.3d 700, 706 (9th Cir.
2007).  If this court requires a permit, the DOH and the EPA
cannot supersede a decision by this court by determining that an
NPDES permit is not required.  <u>See</u> <u>Hammersley</u>, 299 F.3d at 1012.
And if the agencies require an NPDES permit, that does not render
this entire case moot, because the County could still be liable
for the payment of civil penalties.  <u>See</u> <u>Chafin v. Chafin</u>, 133 S.
Ct. 1017, 1023 (2013) ("[A] case becomes moot only when it is

impossible for a court to grant any effectual relief whatever to the prevailing party.") (internal quotation marks omitted). In other words, there is no discernible harm in proceeding with this litigation while the agencies consider the County's application.

By contrast, further delay in this case will result in the continued alleged discharge of pollutants into the ocean. See Lockyer v. Mirant Corp., 398 F.3d 1098, 1110 (9th Cir. 2005) (noting that in assessing whether to issue a stay, a court must consider "the possible damage which may result from the granting of [the] stay"). Over a year and a half has passed since the County submitted its permit application.

The recent issuance of a draft permit suggests that the DOH has concluded that some permit is indeed required. That is, the County may not presently argue that it expects the DOH to announce that no permit is needed. While not privy to the content of the draft permit, this court assumes that its details remain to be resolved. No firm deadline for resolution has been set. At most, the DOH has set a deadline for comments by the EPA, the County, and Plaintiffs' counsel. Revisions may follow, then an opportunity for the public to comment. The best the DOH can predict is the issuance of a final permit "a few months" after it reacts to public comment. The County is therefore asking for the disfavored remedy of an "indefinite, and potentially lengthy" stay for as long as administrative

proceedings may continue.  See <u>Yong v. I.N.S.</u>, 208 F.3d 1116, 1121 (9th Cir. 2000).[1]

It is well settled that "a stay should not be granted unless it appears likely the other proceedings will be concluded within a reasonable time."  <u>Dependable Highway Exp., Inc. v. Navigators Ins. Co.</u>, 498 F.3d 1059, 1066 (9th Cir. 2007).  If a court were to grant an indefinite stay in circumstances such as those now before this court, a defendant would be able to buy itself potentially years of further pollution through last-minute applications for an NPDES permit.  Indeed, a polluting entity would be able to spend years in litigation prior to even applying for an NPDES permit, then seek to stay proceedings for several more years during the pendency of a belatedly submitted application, all the while continuing to release pollutants in violation of the Clean Water Act.  An application for an NPDES permit, without more, cannot justify a lengthy or indefinite stay.

Congress placed no restrictions on citizen suits during the pendency of administrative proceedings, and the County

---

[1] At the hearing on the present motion, the County suggested, as an alternative to an indefinite stay, a stay of three to six months, based on its suggestion that the DOH was concluding a relevant study in July.  The County provides no evidence, however, that the DOH and the EPA are likely to render a decision soon after this alleged study.  Nor does it show why this court cannot or should not address the need for an NPDES permit absent this study.

can identify no particular harm associated with allowing this particular suit to proceed. "The proponent of a stay bears the burden of establishing its need." <u>Clinton v. Jones</u>, 520 U.S. 681, 708 (1997). The County has failed to meet its burden and, as a result, no stay is ordered.

### C. Summary Judgment.

#### 1. Legal standard.

Summary judgment shall be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). <u>See</u> <u>Addisu v. Fred Meyer, Inc.</u>, 198 F.3d 1130, 1134 (9th Cir. 2000). The movants must support their position that a material fact is or is not genuinely disputed by either "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials"; or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c). One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial.  See id. at 323.  The burden initially falls on the moving party to identify for the court those "portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323).  "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (footnote omitted).

The nonmoving party may not rely on the mere allegations in the pleadings and instead must set forth specific facts showing that there is a genuine issue for trial.  T.W. Elec. Serv., 809 F.2d at 630.  At least some "'significant probative evidence tending to support the complaint'" must be produced.  Id. (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 290 (1968)); see also Addisu, 198 F.3d at 1134 ("A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact.").  "[I]f the factual context makes the non-moving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show

that there is a genuine issue for trial." Cal. Arch'l Bldg. Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987) (citing Matsushita Elec. Indus. Co., 475 U.S. at 587). Accord Addisu, 198 F.3d at 1134 ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").

In adjudicating summary judgment motions, the court must view all evidence and inferences in the light most favorable to the nonmoving party. T.W. Elec. Serv., 809 F.2d at 631. Inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party. Id. When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." Id.

> **2.  A party is liable under the Clean Water Act if, without an NPDES permit, it indirectly discharges a pollutant into the ocean through a groundwater conduit.**

The County contends that, to prevail, Plaintiffs must show that the aquifer beneath the LWRF is "navigable water" under the jurisdiction of the Clean Water Act.

It has long been settled "that the meaning of 'navigable waters' in the CWA is broader than the traditional understanding of that term." Rapanos, 547 U.S. at 731 (2006).

27

"[T]he term 'navigable' is of 'limited import' and . . . Congress [has] evidenced its intent to 'regulate at least some waters that would not be deemed 'navigable' under the classical understanding of that term.'" Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engineers, 531 U.S. 159, 167 (2001) (quoting United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 133 (1985)).

The framework for understanding what waters are regulable under the Clean Water Act beyond such "navigable-in-fact" water comes from the Supreme Court's decision in Rapanos. Rapanos presented the Court with the question of whether wetlands adjacent to tributaries of navigable-in-fact water could be described as regulable "waters of the United States." The Court split 4-4-1, with the four Justices in the plurality limiting the definition of "navigable water" under the Act to "those relatively permanent, standing or continuously flowing bodies of water 'forming geographic features' that are described in ordinary parlance as 'streams[,] . . . oceans, rivers, [and] lakes.'" Rapanos, 547 U.S. at 739 (quoting Webster's New International Dictionary 2882 (2d ed.)). The four Justices in the dissent viewed all wetlands adjacent to tributaries of navigable waters as protected under the Act. Id. at 797.

Justice Kennedy, concurring with the plurality, examined whether there was a hydrologic connection sufficient to

establish a "significant nexus." See id. at 786. Under Justice
Kennedy's view, a "significant nexus" exists "if . . . wetlands,
either alone or in combination with similarly situated lands in
the region, significantly affect the chemical, physical, and
biological integrity of other covered waters more readily
understood as 'navigable.'" Id. at 780. Justice Kennedy opined
that this nexus is not satisfied by a "hydrologic linkage" that
is "speculative or insubstantial," but wetlands adjacent to
navigable waterways are covered by the Act given "the reasonable
inference of ecologic interconnnection" with navigable-in-fact
water. Id.

In Healdsburg, the Ninth Circuit read Justice Kennedy's
concurrence as providing the controlling rule. 496 F.3d at
999-1000. Healdsburg involved a waste treatment plant that
discharged sewage into a body of water known as "Basalt Pond," a
rock quarry pit that was filled with water from a surrounding
aquifer located next to the Russian River. See id. at 995. The
Russian River and Basalt Pond were situated on top of a gravel
bed saturated with water such that there was "a continuous
passage of water between Basalt Pond and the Russian River." Id.
at 997. The Ninth Circuit deemed the unpermitted discharge of
pollutants into Basalt Pond to be a violation of the Clean Water
Act. Noting that "water from the Pond seeps into the river
through both the surface wetlands and the underground aquifer"

and that "this hydrological connection . . . [had] a significant effect on the chemical, physical, and biological integrity of the Russian River," the Ninth Circuit held that the relationship between the two bodies of water was "sufficient to confer jurisdiction under the Act pursuant to Justice Kennedy's substantial nexus test."  Id. at 1000.

Although neither Rapanos nor Healdsburg addressed the context of groundwater, the County argues that, in Healdsburg the Ninth Circuit established a two-part test for determining whether there is a significant nexus between bodies of water, including groundwater.  The County says that, given this test, Plaintiffs must show both that a "hydrological connection exists between the Lahaina Facility's UIC groundwater discharges and coastal waters" and that "there are significant physical, chemical and biological impacts as a result of the connection to warrant issuance of an NPDES permit."  See Defendant's Primary Jurisdiction brief at 10-11.  Whether or not this reading of Healdsburg is correct, the parties appear to agree that such a two-part test is a reasonable interpretation of the standard Plaintiffs must meet to show that the aquifer under LWRF is itself "navigable water" under the Act.

However, this court concludes that such a showing is not necessarily the only way in which Plaintiffs may prevail. Under this court's reading of the Clean Water Act and the court's extrapolation from appellate law, Plaintiffs may also prevail if

30

they show that the discharge into the groundwater below the LWRF is functionally equivalent to a discharge into the ocean itself. That is, liability arises even if the groundwater under the LWRF is not itself protected by the Clean Water Act, as long as the groundwater is a conduit through which pollutants are reaching navigable-in-fact water.

The plurality in Rapanos made clear that the prohibition in the Clean Water Act is not limited to "the addition of any pollutant *directly* to navigable waters from any point source," but rather extends to "the addition of any pollutant *to* navigable waters." Rapanos, 547 U.S. at 743 (emphasis in original) (internal quotation marks omitted). "Thus, . . . lower courts have held that the discharge into intermittent channels of any pollutant that naturally washes downstream likely violates § 1311(a), even if the pollutants discharged from a point source do not emit directly into covered waters, but pass through conveyances in between." Id. (internal quotation marks omitted).

The Rapanos plurality also approvingly noted that "many courts have held that . . . upstream, intermittently flowing channels themselves constitute "point sources" under the Act." Rapanos, 547 U.S. at 743. The definition of "point source" under the Clean Water Act includes "any discernible, confined and discrete conveyance, including . . . but not limited to any

31

conduit . . . from which pollutants are or may be discharged."
33 U.S.C. § 1362(14). The Act specifically excludes from the
definition of a point source "agricultural stormwater discharges
and return flows from irrigated agriculture." Id. It may be
inferred from this narrow list of exclusions that Congress sought
to include sufficiently "confined and discrete" groundwater
conduits as "point sources" under the Act. See Tang v. Reno, 77
F.3d 1194, 1197 (9th Cir. 1996) ("An item which is omitted from a
list of exclusions is presumed not to be excluded.") (internal
quotation marks omitted).

There is nothing inherent about groundwater conveyances
and surface water conveyances that requires distinguishing
between these conduits under the Clean Water Act. When either
type of waterway is a conduit through which pollutants reach the
ocean, then there has been the "addition of [a] pollutant to
navigable waters." 33 U.S.C. § 1362(12)(A).

"It would, of course, make a mockery of [the Clean
Water Act's regulatory scheme] if [the] authority to control
pollution was limited to the bed of the navigable stream itself.
The tributaries which join to form the river could then be used
as open sewers as far as federal regulation was concerned."
United States v. Ashland Oil & Transp. Co., 504 F.2d 1317, 1326
(6th Cir. 1974). No less can be said for groundwater flowing
directly into the ocean. See Williams Pipe Line Co. v. Bayer

Corp., 964 F. Supp. 1300, 1319-20 (S.D. Iowa 1997) ("Because the CWA's goal is to protect the quality of surface waters, the NPDES permit system regulates any pollutants that enter such waters either directly or through groundwater."); Washington Wilderness Coal. v. Hecla Min. Co., 870 F. Supp. 983, 990 (E.D. Wash. 1994) ("[S]ince the goal of the CWA is to protect the quality of surface waters, any pollutant which enters such waters, whether directly or through groundwater, is subject to regulation by NPDES permit."). See also Mary Christina Wood, Regulating Discharges into Groundwater: The Crucial Link in Pollution Control Under the Clean Water Act, 12 HARV. ENVTL. L. REV. 569, 596 (1988) ("To forbid pollution of a surface stream, but to permit the stream to be polluted by a nearby waste injection well is a manifest absurdity.").

This view is consistent with the EPA's pronouncements. "As a legal and factual matter, EPA has made a determination that, in general, collected or channeled pollutants conveyed to surface waters via ground water can constitute a discharge subject to the Clean Water Act." National Pollutant Discharge Elimination System Permit Regulation and Effluent Limitations Guidelines and Standards for Concentrated Animal Feeding Operations, Proposed Rule, 66 FR 2960-01, 3017 (Jan. 12, 2001); see also Amendments to the Water Quality Standards Regulations that Pertain to Standards on Indian Reservations, Final Rule, 56

FR 64876, 64892 (Dec. 12, 1991) ("[T]he affected ground waters are not considered 'waters of the United States' but discharges to them are regulated because such discharges are effectively discharges to the directly connected surface waters."). <u>Cf.</u> <u>Wis. Dep't of Health & Family Servs. v. Blumer</u>, 534 U.S. 473, 497, (2002) (noting that an agency's proposed rule "warrants respectful consideration").

This does not mean that groundwater is always and necessarily *itself* part of the navigable waters of the United States. <u>See</u> 66 FR 2960-01 at 3017 ("EPA does not argue that the CWA directly regulates ground water quality."); Definition of "Waters of the United States" Under the Clean Water Act, 79 FR 22188-01, 22218 (Apr. 21, 2014) ("The agencies have never interpreted 'waters of the United States' to include groundwater."). An unpermitted discharge into the groundwater, without more, does not constitute a violation of the Clean Water Act. It is the migration of the pollutant into navigable-in-fact water that brings groundwater under the Clean Water Act. In other words, if a party were only releasing rocks or other fill material that did not cause pollutants to migrate through groundwater, this court would not be talking about this "conduit" theory for liability under the Clean Water Act. This theory applies only when pollutants find their way to navigable-in-fact waters. In that event, a permit is required. <u>See</u> <u>Hecla Mining</u>,

870 F.Supp. at 990 ("[P]ollutants must be traced from their source to surface waters, in order to come within the purview of the CWA.").

While there appears to be a split in authority over whether groundwater pollution violates the Clean Water Act, this split may largely flow from a lack of clarity by courts as to whether they are determining that groundwater itself may or may not be regulated under the Clean Water Act or are determining that groundwater may or may not be regulated when it serves as a conduit to water that is indeed regulated. Almost every court that has allowed unpermitted discharges into groundwater has done so under the theory that the groundwater is not *itself* "water of the United States." That is, those courts were not determining whether discharging pollutants into groundwater *conduits* required a permit. See, e.g., <u>Vill. of Oconomowoc Lake v. Dayton Hudson Corp.</u>, 24 F.3d 962, 965 (7th Cir. 1994); <u>Umatilla Waterquality Protective Ass'n, Inc. v. Smith Frozen Foods, Inc.</u>, 962 F. Supp. 1312, 1318 (D. Or. 1997).

While it makes sense to regulate groundwater under the conduit theory, this court acknowledges that it cannot point to controlling appellate law or statutory text expressly allowing this theory in the present context.[2] The Supreme Court in

---

[2] In deciding that Justice Kennedy's concurrence in <u>Rapanos</u> is the controlling rule of law in the Ninth Circuit, the majority in <u>Healdsburg</u> was addressing only the question in that case,

Rapanos dealt only with wetlands that the EPA argued had ecological value in and of themselves. The value of the wetlands in question was not necessarily that they were conduits into navigable-in-fact water, but that they had independent ecological worth because of such functions as "providing critical habitat for aquatic animal species." 547 U.S. at 766. Even when the wetlands in question required protection because of their "critical functions related to the integrity of other waters," those functions, "such as pollutant trapping, flood control, and runoff storage" went beyond the simple transmission of pollutants. Id. at 779. For those reasons the wetlands at issue in Rapanos may have required protection even if there was no possibility that the pollutants would migrate into navigable-in-fact water. Id. at 744 (noting that the case involved "dredged or fill material, which is typically deposited for the sole purpose of staying put, does not normally wash downstream, and thus does not normally constitute an addition . . . to navigable waters when deposited in upstream isolated wetlands").

By contrast, Plaintiffs here do not appear to be arguing that the County would necessarily require an NPDES permit if it deposited material in the aquifer that did not find its way

which, as in Rapanos, involved whether particular wetlands were themselves navigable waters of the United States. Admittedly, neither Healdsburg nor Justice Kennedy's concurrence in Rapanos applied the conduit theory discussed here to groundwater.

to the ocean.  Instead, the harm alleged appears to be based on the migration of the effluent to the ocean.  That is, Plaintiffs do not appear to be arguing that the groundwater requires protection for its own independent ecological value.  Instead, the concern is that the County should not be allowed to pollute the ocean *through* that groundwater.

The test articulated by the Ninth Circuit in <u>Healdsburg</u> is not a good fit when groundwater is involved.  If the <u>Healdsburg</u> test is the *only* way through which a discharge into groundwater could be determined to come under the Clean Water Act, <u>Healdsburg</u> poses enormous barriers to the regulation of groundwater--barriers that even the plurality in <u>Rapanos</u> would likely not endorse.  Under a strict application of <u>Healdsburg</u>, even with definitive proof that 100% of all pollutants discharged from a point source into groundwater rapidly reach the ocean, a permit would not be required unless there are also significant effects on the physical, biological, and chemical integrity of the ocean.

The Clean Water Act creates a strict liability scheme that "categorically prohibits any discharge of a pollutant from a point source without a permit," irrespective of whether that discharge affects the receiving water.  <u>Comm. To Save Mokelumne River v. E. Bay Mun. Util. Dist.</u>, 13 F.3d 305, 309 (9th Cir. 1993).  Applying <u>Healdsburg</u> to cases of groundwater pollution

could undermine the Clean Water Act's strict liability scheme, as it would require plaintiffs to show *both* that pollutants are being discharged into navigable water *and* that those pollutants are affecting the receiving water. Congress intended to bar all unpermitted discharges, without regard to their effects on protected waters; Congress did not intend a scheme whereby certain citizen suit plaintiffs were subject to entirely different proof requirements based solely on the manner in which pollutants reach the ocean. Drawing such a distinction is not only illogical, it runs counter to the structure and intent of the Act.

This court is not reading Healdsburg as requiring such a distinction. Healdsburg does not *sub silentio* create novel and significant barriers to groundwater regulation. Instead, this court reads Healdsburg as limited to situations in which, as in Rapanos, a plaintiff seeks to protect a particular wetland in and of itself. Healdsburg does not require that a plaintiff who shows that pollutants indirectly reach navigable-in-fact water must make a further showing that those pollutants have significantly affected the receiving water.

Of course, a plaintiff must demonstrate more than "a general hydrological connection between all waters." Hecla Min. Co., 870 F. Supp. at 990. Plaintiffs in the present case must show that pollutants can be *directly traced* from the injection

wells to the ocean such that the discharge at the LWRF is a *de
facto* discharge into the ocean.  Further, Plaintiffs must show
that the level of pollutants emerging into navigable-in-fact
water is more than *de minimis*.  If they make these showings, it
would make no sense to exempt a polluter from regulation simply
because its pollution passes through a conduit.  If the point of
emission is readily identified, and the transmission path to the
ocean is clearly ascertainable, the discharge is functionally one
into navigable water.

That is not to say that groundwater can never be
regulated under the Healdsburg test.  An aquifer with a
substantial nexus with navigable-in-fact water may itself be
protected under the Clean Water Act even if it is not necessarily
a conduit for pollutants.  But when it is established that
groundwater is a conduit for pollutants, liability may attach to
a discharge into that groundwater even if the groundwater is not
itself protected under the Act.

> **3.   It is undisputed that the County has
> discharged pollutants into the ocean through
> the conduit of the groundwater below the
> LWRF.**

Applying the above analysis to the present case, the
court first addresses whether the groundwater under the LWRF
constitutes a conduit to the ocean.

The central finding of the Tracer Dye Study—and the
centerpiece of Plaintiffs' case—is that "64% of the treated

wastewater injected into wells [3 and 4] currently discharges from the submarine spring areas" and into the ocean.  Tracer Dye Study at ES-2,3; Paytan Decl. ¶ 18.  Because wells 3 and 4 "receive more than 80 percent of the treated wastewater," see Tracer Dye Study ES-21, it appears that over 50% of the wastewater discharged at the LWRF emerges into the ocean.  At the hearing on the present motions, the County admitted that pollutants discharged at the LWRF are reaching the ocean, but disputed the specific quantities stated in the Trace Dye Study. What the County failed to do was explain why it believed the quantities cited in the Study were incorrect.  Nor did the County point to any evidence in the record disputing the Study's precise findings.

The County's expert, Paulsen, maintains that, "as groundwater moves through the subsurface, various chemical and biological reactions can occur that alter the characteristics of the groundwater."  Paulsen Decl. ¶ 17.  However, neither that statement nor the rest of Paulsen's declaration indicates that the chemical and biological reactions that occur as the effluent travels through the groundwater to the ocean transform the effluent into something other than a "pollutant."  In other words, even if, for example, the levels of nitrogen and phosphorus in the water being released at the seeps are less than in the effluent injected at the wells, that does not mean that

the water at the seeps is not or does not contain a "pollutant" within the meaning of the Act.  Indeed, at the hearing on the present motion, the County explicitly disclaimed any such argument, conceding that "pollutants" were released at the seeps.

The County appeared to be arguing at the hearing that deep groundwater could not, as a matter of law, be viewed as a "conduit" because of these diffusive effects.  That is, the County appeared to be arguing that any channel or conveyance to the ocean may be considered a conduit only if it "confine[s] or contain[s] the water."  This argument elides the distinction between a point source and a conduit.  A point source is specifically defined in the Clean Water Act as a "confined and discrete conveyance."  While any conduit that is a "confined and discrete conveyance" is a point source, that does not mean that all conduits must be "confined and discrete conveyances."  An injection well itself is a point source, and the groundwater acting as a conduit need not also be "confined and discrete."  Courts have adopted "the 'indirect discharge' rationale and the 'point source' rationale *in the alternative*."  <u>Rapanos</u>, 547 U.S. at 744 (emphasis added).  It would be anomalous for those alternative rationales to merge into a single rationale.

In any event, nothing in the record suggests that the groundwater is not itself a "confined and discrete conveyance." <u>See</u> <u>United States v. Earth Sciences, Inc.</u>, 599 F.2d 368, 373

(10th Cir. 1979) ("The concept of a point source was designed to further this scheme by embracing the broadest possible definition of any identifiable conveyance from which pollutants might enter the waters of the United States."). The definition of "point source" is limited to "confined and discrete conveyances" to minimize the difficulty of discerning the source of pollutants. See Trustees for Alaska v. E.P.A., 749 F.2d 549, 558 (9th Cir. 1984). The finding of the Tracer Dye Study is that more than 50% of the effluent originating at the LWRF is finding its way into the ocean. Any conveyance that transmits such a high proportion of a pollutant from one place to another is consistent with being "confined and discrete," irrespective of its other geologic properties.

The County's theory that groundwater cannot be considered a conduit because it is not "confined and discrete" would lead to the radical conclusion that *all* conveyances through groundwater into the ocean are permissible under the Act, even if 100% of the pollutants find their way into the ocean. Recognizing that such a contention conflicts with the numerous cases holding that the Act prohibits indirect pollution through groundwater, the County carves out an exception to its theory for transmission through "shallow subsurface" water. Neither logic nor case law supports distinguishing between "shallow" and "deep" groundwater. The key factor is not the depth of the groundwater,

but the existence of a pollutant that eventually reaches the
ocean.  It would make no sense to conclude that the release of
pollutants into "shallow subsurface water" surrounded by
impermeable rock requires a permit, but the release of pollutants
into "deep" groundwater does not require a permit even if the
latter involves far greater transmission of pollutants into the
ocean.  And neither case authorities nor statutory or regulatory
language provides any clue as to the precise measurement that
might render groundwater deep.

Of course, releasing water deeper underground may
correlate to diffusion of a pollutant before it reaches the
ocean.  That diffusion may sometimes be so great that it is no
longer reasonable to conclude that any pollutant is reaching the
ocean.  But depth is not the only consideration in determining
whether pollutants are reaching navigable-in-fact water.  Other
factors, such as the permeability of the rock, may be equally
important.  There is no support, therefore, for creating a
categorical exclusion for "deep" groundwater.  The core inquiry
must be a case-by-case determination of whether pollutants are
reaching navigable-in-fact water.  That determination is
immensely simplified in the present case by the presence of an
independently produced report that traces pollutants from the
LWRF to the ocean.

At the hearing, the County also suggested that the effluent was diffused as it spread through the groundwater, and that such diffusion precluded a finding that the groundwater was a conduit to navigable water. But liability under the Clean Water Act is triggered when pollutants reach navigable water, regardless of *how* they get there. As with a "deep" conduit, a diffused conduit is no less covered under the Act if it actually conveys pollutants to navigable-in-fact water.

Under the County's "diffusion" theory, for example, a single pipe taking effluent to the ocean would be covered under the Clean Water Act, but 50 smaller pipes, taking the same quantity of pollutant into the ocean, might not. Nothing in the Act supports relying on the manner in which the pollutants travel to determine liability.

Similarly, at the hearing, the County argued that the injection wells were "too far" from the ocean to qualify as conduits. Counsel for the County admitted, however, that if the pollutant traveled in a half-mile-long lava tube that confined the water, it would constitute a "direct" discharge into the ocean. To the County therefore, distance appeared to be a proxy for the degree of diffusion. Because diffusion is itself only relevant to the extent it may prevent the water from reaching the ocean, there is no support for a categorical rule that allows any

discharge of pollutants through groundwater so long as the discharge originates a certain distance from the ocean.

This court recognizes that, in the absence of a tracer dye study, depth, diffusion, and distance might serve as proxies to help a court determine how much, if any, pollutant is reaching navigable-in-fact water. But such approximations are unnecessary when pollutants have been precisely traced from the point of discharge to the ocean.

Liability under the Clean Water Act is triggered as soon as pollutants are discharged into navigable water from a point source. See Headwaters, 243 F.3d at 532. The core undisputed fact of this case is that pollutants discharged by the County at the LWRF injection wells migrate to the ocean. Having no NPDES permit allowing this discharge, the County is violating the Clean Water Act.

> **4.    Even under Healdsburg's two-part test, Plaintiffs are entitled to summary judgment on the issue of whether the County has violated the Clean Water Act.**

As discussed in Section III(C)(2) of this order, the Healdsburg test may present significant obstacles to the regulation of groundwater by requiring plaintiffs who are able to clearly show pollutants flowing into protected water to also demonstrate that the flow of those pollutants has "significant effects." In many cases, "significant effects" may not be discernable until considerable pollution has already occurred.

In other cases, plaintiffs may not have the resources to identify such effects. The present case does not present those difficulties. The record before this court is exceptionally extensive. The discharges from the LWRF have been the subject of investigation and scrutiny by scientists and federal and state authorities for over a decade. The consensus of the numerous studies and reports placed before the court appears to be that effluent from the LWRF is reaching the ocean and is significantly affecting the water near the submarine seeps where it is being discharged. This record allows this court to conclude, even under the Healdsburg test, that the County is violating the Clean Water Act.

In referring to the Healdsburg test, this court notes that the parties appear to agree that, under Healdsburg, Plaintiffs must show that there is both a "hydrologic connection" between the aquifer under the LWRF and the ocean, and that the aquifer "either alone or in combination with similarly situated [wet]lands in the region, significantly affect[s] the chemical, physical, and biological integrity of [the ocean]." Healdsburg, 496 F.3d at 1000 (internal quotation marks omitted).

Healdsburg itself does not actually speak of a "two-part" test. Instead it simply states that "wetlands are regulable under the CWA only if there is a significant nexus between the wetlands at issue and the navigable waterway." 496

F.3d at 1000.  Healdsburg notes that "mere hydrologic connection should not suffice in all cases [because] the connection may be too insubstantial for the hydrologic linkage to establish the required nexus with navigable waters as traditionally understood."  Id. (internal quotation marks omitted).  Instead of expressly articulating a "two-part" test, this statement recognizes that a hydrologic connection does not alone meet the significant nexus test.  In other words, if there are two bodies of water with no hydrologic connection that affect one another's "chemical, physical or biological integrity," they may still be regulable under the Act.  Because the aquifer under the LWRF and the ocean have a clear hydrological connection, the court is not faced with such a circumstance.  However, given the parties' agreement that Healdsburg creates a two-part test, the court applies their framework for the purposes of deciding this part of the motion, although the court is not thereby ruling that the parties' agreement is necessarily the correct application of Healdsburg.

As a threshold matter, the County argues that groundwater categorically cannot be considered a "water of the United States," irrespective of any nexus it may have with navigable-in-fact water.  The County's primary basis for this assertion is a recently proposed rule by the EPA and the Army Corps of Engineers stating, "Groundwater, including groundwater

drained through subsurface drainage systems . . . [is] expressly not 'water[] of the United States' by rule."  79 FR 22188-01 at 22218.  If this rule were to become final, it would be entitled to deference by this court under Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984), and would likely mean that the groundwater under the LWRF could not itself be considered "water of the United States."  It is important to note that, even if this rule does become final, it need not affect the indirect discharge theory discussed in Section III(C)(2) of this order.  In keeping with the agencies' pronouncements, the indirect discharge theory does not treat groundwater as itself "water of the United States," but as a conduit to such water.  If adopted, the proposed rule would, however, affect whether Plaintiffs may prevail on the alternative theory that the discharge at the LWRF meets the Healdsburg test.

In the Ninth Circuit, "proposed regulations carry no more weight than a position advanced on brief."  Tedori v. United States, 211 F.3d 488, 492 (9th Cir. 2000) (citation omitted). The proposed rule purports to interpret the statutory language of the Clean Water Act.  When agencies have asserted new interpretations of statutory language in legal briefs, the Ninth Circuit has consistently declined to give controlling weight to the agency's pronouncements.  See, e.g., Christopher v. SmithKline Beecham Corp., 635 F.3d 383, 395 (9th Cir. 2011); N.

Cal. River Watch v. Wilcox, 633 F.3d 766, 780 (9th Cir. 2011).
Because proposed rules are not entitled to more respect than
positions advocated in briefs, the proposed groundwater rule is
similarly not owed deference here.  To hold otherwise would give
similar force in the courts to an agency's proposed and final
rules.  Such a result would, to some degree, allow agencies to
circumvent the very notice and comment process that the Supreme
Court has found to be highly relevant in determining the
deference owed to an agency interpretation.  United States v.
Mead Corp., 533 U.S. 218, 230 (2001)

        Therefore, while the court gives "respectful
consideration," Blumer, 534 U.S. at 497, to the agencies'
proposed categorical exclusion of groundwater from the definition
of the "waters of the United States," the agencies' view does not
control.  Instead, the court must make a determination based on
the unique facts present here regarding whether the aquifer under
the LWRF is regulable under the Clean Water Act.  This court now
applies the parties' two-part test to that subject.

        The County argues that, to meet the first part of its
reading of the Healdsburg test, Plaintiffs must demonstrate a
hydrologic connection between the aquifer and the ocean that is
"direct and immediate."  The County cites almost no authority to
support its novel "direct and immediate" requirement and does not
articulate what constitutes a sufficiently "direct" or

"immediate" connection.  The cases the County relies on in describing its "direct and immediate" requirement actually support the conclusion that the hydrologic connection between the aquifer and ocean here is sufficiently "direct and immediate."

For example, in <u>Greater Yellowstone Coalition v. Larson</u>, 641 F. Supp. 2d 1120, 1139 (D. Idaho 2009), the court held that it was not arbitrary and capricious for the EPA to decide that there was no hydrologic connection when pollutants traveled "between one to four miles until reaching the surface water," and "would take between 60 and 420 years for peak concentrations . . . to arrive at surface water."  Here, the effluent travels for less than half a mile and reaches the ocean within three months of discharge.  The <u>Larson</u> court considered the degree of hydrologic connection to involve a close question despite the much longer distance and vastly slower speed the pollutants traveled in that case.  <u>Larson</u> therefore supports the conclusion that the discharge at the LWRF has a "direct and immediate" hydrologic connection with the ocean.

Similarly, the court in <u>Association Concerned Over Resources And Nature, Inc. v. Tennessee Aluminum Processors, Inc.</u> 2011 WL 1357690 at *18 (M.D. Tenn. Apr. 11, 2011), required the plaintiffs to show only "a link between contaminated ground waters and navigable waters."  Nothing in that case suggests that

the link between the aquifer under the LWRF and the ocean is insufficiently direct.

The County further argues that the "direct and immediate" requirement is consistent with Healdsburg because the court in that case found "a hydrological connection between a pond and nearby river where 'a change in the water level in one *immediately* affect[ed] the water level in the other.'" Opp. at 7 (emphasis in original) (quoting Healdsburg, 496 F.3d at 1000). But that language in Healdsburg relates to the "physical connection" between the Basalt Pond and the Russian River under the second prong of the test, not to the degree of hydrologic connection under the first prong. In any event, Healdsburg does not purport to set the outer bounds of the Clean Water Act's applicability. The County fails to establish that any hydrologic connection less than the one at issue in Healdsburg is insufficient to trigger liability under the Clean Water Act.

Unlike the courts in the cases discussed above, this court has before it the Tracer Dye Study, which indisputably demonstrates the relatively rapid flow of significant quantities of pollutant from the LWRF to the ocean. In these circumstances, it would be anomalous for the court to read Healdsburg, or any other case, as requiring a finding of no hydrologic connection. Plaintiffs clearly meet the first prong of the Healdsburg test.

This court turns to the second part of the test defined by the parties--whether the water in the aquifer "significantly affects the [ocean's] physical, biological and chemical integrity." See Healdsburg, 496 F.3d at 1001. Plaintiffs contend that the ocean water close to the submarine seeps has been affected in five separate ways.

First, Plaintiffs contend that water near the seeps has "exceptionally elevated" levels of nitrogen and phosphorus. See Smith Decl. 11, 17-19. In particular, the area near the seeps apparently has the highest levels of sewage-derived nitrogen "ever reported in the scientific literature." Id. ¶ 8. Elevated levels of such nutrients can accelerate the growth of fleshy seaweed and algae, which can compete with, outgrow, and kill coral. Id. ¶ 20. In keeping with this conclusion, the coral reefs near the submarine seeps have been subject to algal blooms that have led to a decline in coral cover from 55% to 33% between 1994 and 2006. Id. ¶ 25.

Second, Plaintiffs show that the water near the submarine seeps is substantially more acidic than the rest of the ocean's nearshore water. Id. ¶ 29; Tracer Dye Study at 2-12, 2-13. This ocean acidification reduces the amount of carbonate ions available for species such as corals, mussels, and limpets, and promotes the growth of seaweed that competes with coral. Smith Decl. ¶ 27.

Third, Plaintiffs demonstrate that the emerging water has lower salinity than the ocean water, <u>see</u> Tracer Dye Study at 2-12, 2-13, and this low salinity can be harmful to coral that has evolved to live in seawater rather than freshwater. Smith Decl. ¶ 33.

Fourth, Plaintiffs show that oxygen concentrations from the water emerging from the seeps is substantially lower than in the marine water elsewhere in West Maui. Smith Decl. ¶ 35; Paytan Decl. ¶ 34. The lack of oxygen can suffocate coral and promote the growth of seaweed. Smith Decl. ¶¶ 34-36; Paytan Decl. ¶¶ 34-35.

Fifth, Plaintiffs show that the water temperature is substantially elevated near the seeps. <u>See</u> Tracer Dye Study at 2-12, 2-13. The Tracer Dye Study found that these higher temperatures extended over more than 167 acres around the seeps. <u>See</u> Paytan Decl. ¶¶ 26-29. These higher temperatures can lead to bleaching and death of the coral in the affected area. <u>See</u> Smith Decl. ¶ 37.

Neither the County nor their experts dispute that the water directly emerging from the seeps bears these properties. Nor do they dispute that the theoretical effect of such alterations to ocean water would be to damage coral in the ways described above. Rather, the County argues that "measurements at the seeps fail to account for mixing of the seep discharge with

ocean water."  Memo. in Opp. to Motion for Summary Judgment at 16; see also Paulsen Dec., ¶¶ 23, 38; Dollar Dec., ¶ 12-13.  The County and their experts note that, as the water emerging from the seeps moves through the water column, the effects of the effluent dissipate.  Id.  As the County puts it, "[a]ny effects of the seep discharge are . . . attenuated, particularly given the small area of the seeps compared to the entire reef."  Memo in Opp. at 17-18.  The County's experts contend that, given this dispersion of effluent, the reef in the nearshore area is not being harmed by the discharge at the LWRF.  See, e.g., Dollar Dec., ¶ 44. ("[A]ll reef areas appeared essentially pristine, i.e., no observed bleached, diseased, or otherwise stressed corals.").

Even accepting these statements by the County's experts, the court finds that there is no genuine dispute that the discharge at the LWRF significantly affects the physical, chemical, and biological integrity of the ocean water.  There is no dispute that water is flowing from the aquifer into the ocean, and that the properties of the aquifer water can and are altering the properties of water near the seeps.  Of course, given the vastness of the ocean, these effects will dissipate as the aquifer water is dispersed into ocean water.  To hold that an "effect" is "insignificant" merely because of such dispersion would license unfettered discharge into any body of water

54

voluminous enough to rapidly diffuse the effects of the effluent. Ocean water near the seeps is, indisputably, being significantly affected. The County provides no basis for the contention that these effects must be felt throughout all the nearshore waters to meet the "significant effects" test.

Notably absent from the County's analysis is any framework for determining when such dispersion renders an effect "insignificant." The effects of any amount of pollutant will eventually disperse as the pollutant travels through the ocean, but the County does not articulate how great a distance from the discharge an "effect" must be felt for it to be deemed "significant."

The crux of the "significant effects" test is determining whether the aquifer's "effects on water quality are speculative or insubstantial, [such that] they fall outside the zone fairly encompassed by the statutory term 'navigable waters.'" Healdsburg, 496 F.3d at 1000 (quoting Rapanos, 547 U.S. at 717 (Kennedy, J., concurring in judgment)). Here, the effect is indisputably neither speculative nor insubstantial. The LWRF releases three to five million gallons of effluent a day; an independent EPA study has determined that at least 50% of this effluent makes its way relatively rapidly into the ocean; this effluent has properties that can radically alter the properties of the water it is introduced into; and such radical

effects have been observed and measured at the point of discharge into the ocean.  If such a relationship is considered "speculative" and "insubstantial," it is hard to imagine any groundwater connection meeting what the parties construe as the Healdsburg test.

Finally, the County's assertion that coral is not being damaged and is "pristine," even if true, is irrelevant for determining a significant nexus.  An "effect" on the ocean is not coextensive with "harm" to the ocean.  Comm. To Save Mokelumne River, 13 F.3d at 309 (noting that the CWA "does not impose liability only where a point source discharge creates a net increase in the level of pollution" but instead creates a strict liability scheme that "categorically prohibits any discharge of a pollutant from a point source without a permit").  The undisputed physical, chemical and biological changes observed in the water near the seeps are sufficient to establish that the aquifer and the ocean have the required nexus.  To establish the County's liability, Plaintiffs need not show that coral or other marine life has been damaged or harmed.

The only reasonable inference that the undisputed evidence permits is that the discharge into the aquifer significantly affects the physical, chemical and biological integrity of the receiving waters.  Both prongs of the Healdsburg test defined by the parties are met here.  Therefore, the

County's discharge of pollutants into the aquifer beneath the LWRF without an NPDES permit is a violation of the Clean Water Act.

In concluding that Plaintiffs in this case prevail even under the Healdsburg two-part test they have defined, this court is not suggesting that Healdsburg must be applied to all cases involving groundwater pollution. This case does not require this court to address, for example, whether Healdsburg bars the introduction of pollutants into groundwater that do not migrate to navigable-in-fact water. This court holds only that, given the undisputed evidence in the record showing that pollutants rapidly flow from the aquifer into the ocean and cause significant change to the ocean water near the submarine seeps, the County is liable under both the Healdsburg framework articulated by the parties and the indirect discharge (or "conduit") framework. The Healdsburg test, which developed in the context of wetlands that plaintiffs sought to protect for the wetlands' own ecological value, may not always provide a good fit for cases involving groundwater. If Healdsburg, rather than the "conduit" theory, is to govern groundwater cases, it may require further clarification and elaboration in cases with fact patterns different from the one before this court. In the present case, however, the Healdsburg test relied on by the parties leads ineluctably to the same conclusion as the "conduit" theory: the

County's release of pollutants at the LWRF without an NPDES permit violates the Clean Water Act.

IV.     **CONCLUSION.**

The court denies Defendant's motion for judgment on the pleadings or, in the alternative, a stay.  The court grants Plaintiffs' motion for partial summary judgment as to the County's liability under the Clean Water Act.  The court makes no determination at this stage regarding any civil penalties.

The court grants the County's two requests for judicial notice and denies the county's motion to strike expert declarations.

Because Plaintiffs are prevailing on the substantive motions before this court, the court sees no need to address the merits of their Motion to Strike Defendant's Second May 23, 2014 Letter.  That motion is denied.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, May 30, 2014.



/s/ Susan Oki Mollway
Susan Oki Mollway
Chief United States District Judge