DAVID L. HENKIN          #6876
MAHESH CLEVELAND     #11023
EARTHJUSTICE
850 Richards Street, Suite 400
Honolulu, Hawai‘i 96813
Telephone No.: (808) 599-2436
Fax No.: (808) 521-6841
Email:  dhenkin@earthjustice.org
         mcleveland@earthjustice.org

Attorneys for Plaintiffs


IN THE UNITED STATES DISTRICT COURT

DISTRICT OF HAWAI‘I

| | |
|---|---|
| HAWAI‘I WILDLIFE FUND, a Hawai‘i non-profit corporation, SIERRA CLUB - MAUI GROUP, a non-profit corporation, SURFRIDER FOUNDATION, a non-profit corporation, and WEST MAUI PRESERVATION ASSOCIATION, a Hawai‘i non-profit corporation, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF MAUI, <br><br> Defendant. | CIVIL NO. 12-00198 SOM KJM <br><br> DECLARATION OF DAVID L. HENKIN |


DECLARATION OF DAVID L. HENKIN

I, DAVID L. HENKIN, declare that, if called as a witness in this action, I could testify of my own personal knowledge under penalty of perjury that:

1.      I am an attorney with the Mid-Pacific (Honolulu) office of Earthjustice, the attorneys of record for plaintiffs Hawai'i Wildlife Fund, Sierra Club-Maui Group, Surfrider Foundation and West Maui Preservation Association in this action. I am admitted to practice law before this Court and all courts of the State of Hawai'i. If called as a witness, I could and would testify competently to the matters set forth herein. I submit this declaration in support of Plaintiffs' Motion for Award of Attorney's Fees and Costs.

2.      I graduated from Yale Law School in 1991. Following graduation, I clerked for the Honorable R. Lanier Anderson III, United States Court of Appeals for the Eleventh Circuit. From 1993 to the present, my legal practice has consisted exclusively of litigation to enforce compliance with a variety of environmental statutes, including, but not limited to, the Clean Water Act ("CWA"), the Endangered Species Act, the National Environmental Policy Act, and the Marine Mammal Protection Act.

3.      In 1995, I joined the Honolulu office of Earthjustice (then known as Sierra Club Legal Defense Fund), first as a project attorney, then as an associate attorney, and, for the past twenty-three years, as a senior attorney (formerly titled

"staff attorney"). At Earthjustice, I litigate cases involving a wide variety of state and federal environmental laws.

4.      Earthjustice is a non-profit, 501(c)(3) organization that provides pro bono representation to clients. Accordingly, Earthjustice has not charged Plaintiffs for any of the time that Earthjustice attorneys spent litigating this case.

5.      The parties previously settled Plaintiffs' claims for fees and costs related to the proceedings before this Court that occurred prior to Defendant County of Maui's appeals and also related to proceedings before the Ninth Circuit Court of Appeals. Therefore, Plaintiffs now seek to recover fees and nontaxable costs for only the phases of this case before the United States Supreme Court and before this Court on remand.

6.      Pursuant to Local Rule 54.2(f)(1) through (3), attached hereto as Exhibit 1 is a table that summarizes the total fees requested in Plaintiffs' motion, through today's date, followed by a chart that describes the services rendered in chronological order.

7.      Pursuant to Local Rule 54.2(f)(5)(C), the chart in Exhibit 1 identifies adjustments to the listed time entries made in the course of exercising billing judgment. Plaintiffs are not seeking to recover for any of the time spent on this case by former managing attorney of Earthjustice's Mid-Pacific Office Paul Achitoff (PHA; 1.0 hour) or law clerks Ahlia Bethea (AB; 0.3 hours), Colin Lee

(CLEE; 0.5 hours), Clair Leonard (Cleonard; 1.8 hours), and Kaulu Luʻuwai (KL; 37.5 hours).

8.  The declarations of the attorneys for whom Plaintiffs seek an award of fees identify additional adjustments, based on billing judgment, to the work each attorney performed.

9.  Attached hereto as Exhibit 2 is a summary table of all nontaxable costs for which Plaintiffs seek an award, through today's date.

10. Pursuant to Local Rule 54.2(f)(4), attached hereto as Exhibit 3 are true and correct copies of invoices and receipts for the nontaxable costs to which Defendant has not objected, with confidential personal information and information related to other clients redacted. The first page of Exhibit 3 is an index indicating the invoices and receipts that relate to each item of nontaxable costs for which Plaintiffs seek an award. For ease of reference, each page of the invoices and receipts in Exhibit 3 has been Bates-stamped with a series beginning "EX 3-1." Invoices and receipts for the nontaxable costs to which Defendant does object are attached to the declaration of the attorney who incurred the cost in question.

11. On August 23, 2021, I provided counsel for Defendant with the information specified in Local Rule 54.2(d)(1)-(3).

12. On September 7, 2021, Brian Bilberry, lead counsel for Defendant on remand, sent me an email stating objections to some of Plaintiffs' requested hours,

3

rates, and nontaxable expenses. Mr. Bilberry did not—at that time or at any time since—provide any evidence that Defendant intends to use to oppose the requested hours, rates, or nontaxable expenses.

13.    In subsequent negotiations, the parties were able to reach agreement regarding the hourly rates for the attorneys whose fees are being claimed. The parties also reached agreement about the hourly rate for Earthjustice's law clerks ($100). In the exercise of billing judgment, Plaintiffs are not seeking recovery for the law clerks' work on this case.

14.    The parties were also able to reach agreement about some, but not all, of Defendant's objections to Plaintiffs' requested hours and nontaxable expenses. Attached hereto as Exhibit 4 is a true and correct copy of the Joint Statement of the Parties Pursuant to Local Rule 54.2(e) (dated September 24, 2021), with attached Exhibits A, B, and C. Subsequently to finalizing the Joint Statement, Plaintiffs decided that they would no longer seek recovery of their share of costs taxed in the Supreme Court, which are listed on page 2 of Exhibit C of the Joint Statement.

15.    At no time during the LR 54.2(d) pre-motion meet and confer did Defendant ever identify any allegedly special circumstances that it claims would warrant denying an award of fees or costs to Plaintiffs.

16.    Since the inception of this case in 2012, I have been the lead counsel for Plaintiffs. As the lead counsel, I have had the primary responsibility for all

4

aspects of the case, whether discovery, motion practice or oral argument. The one exception is that Scott Nelson of Public Citizen, an attorney with significant Supreme Court experience who is widely regarded as one of the best Supreme Court brief writers, was primary author of Plaintiffs' answering brief in the Supreme Court.

17.    I have reviewed and approved the time set forth in Exhibit 1. The entries on this timesheet represent only a fraction of the time I spent working on this case. I spent substantial additional time getting up to speed on the nuances of practice before the Supreme Court (including traveling to Washington, D.C., after the grant of certiorari to observe the Court during one of its sittings in March 2020), participating in internal and external meetings, reviewing emails, participating in strategy calls, addressing press inquiries, or performing other tasks. In the exercise of billing judgment, Plaintiffs are not seeking to recover for any of this time, which I estimate exceeds 200 hours. In the further exercise of billing judgment, Plaintiffs also are not seeking to recover for 93 hours of my time that are detailed in Exhibit 1 (about 5% of the total).

18.    All my time for which Plaintiffs are seeking recovery was reasonably necessary for me to contribute to the excellent results that Plaintiffs secured in both the Supreme Court and this Court.

5

19.    During most of the initial round of proceedings before this Court and then on appeal to the Ninth Circuit, Defendant was represented by special counsel from the law firm Hunton & Williams LLP, rather than attorneys in Defendant's Department of the Corporation Counsel. On April 6, 2018, after the Ninth Circuit denied Defendant's motion for *en banc* rehearing of the Ninth Circuit's decision upholding this Court's rulings, the Maui County Council voted to increase the compensation authorized to pay this outside counsel by $250,000 (to $3.55 million).

20.    Attached hereto as Exhibit 5 is a true and correct copy of Council Communication No. 18-130, which transmitted to the Maui County Council Chair the resolution authorizing the increase in funding. This document is available at https://mauicounty.legistar.com/View.ashx?M=F&ID=6167257&GUID=D76904CE-706B-4E2E-9E48-254078F74FA3 (last visited September 24, 2021).

21.    Attached hereto as Exhibit 6 are excerpts from a true and correct copy of the minutes of the Maui County Council's April 6, 2018 meeting where the Council adopted the funding increase. These minutes are available at https://mauicounty.legistar.com/View.ashx?M=M&ID=600252&GUID=D30E495B-D3DC-4536-94C8-8BB1398EEFE3 (last visited September 24, 2021).

22.    On August 27, 2018, Defendant filed its petition for writ of certiorari. On October 10, 2018, while the petition was pending, Deputy Corporation Counsel

6

Richelle Thomson wrote to the Chair of the Maui County Council's Parks, Recreation, Energy, and Legal Affairs Committee, seeking an additional $500,000 increase in funding for outside counsel (now known as Hunton Andrews Kurth LLP) to pursue the County's appeal to the Supreme Court. Attached hereto as Exhibit 7 is a true and correct copy of this letter, which is available at https://mauicounty.legistar.com/View.ashx?M=F&ID=6676641&GUID=EB0AB352-62B9-4AF6-A54A-9BE9D35A67E5 (last visited September 24, 2021).

23.    On November 15, 2018, the Chair of the Maui County Council's Parks, Recreation, Energy, and Legal Affairs Committee presented the Corporation Counsel's request for additional funding to the full Council, which approved the request. Attached hereto as Exhibit 8 is a true and correct copy of Maui County Council Committee Report 18-202 (dated November 15, 2018), *available at* https://mauicounty.legistar.com/View.ashx?M=F&ID=6733256&GUID=0256610B-ECFB-445E-B5D4-F2CBA29F6DB8 (last visited September 24, 2021). Attached hereto as Exhibit 9 are excerpts from a true and correct copy of the minutes of the November 15, 2018 Maui County Council meeting, *available at* https://mauicounty.legistar.com/View.ashx?M=M&ID=649015&GUID=5E3D8ADD-71FE-4BAC-930C-8F17F386ACB5 (last visited September 24, 2021).

24.    Attached hereto as Exhibit 10 is a table summarizing all the hours for work before the United States Supreme Court for which Plaintiffs seek recovery.

7

25.    At the same time Defendant was petitioning the Supreme Court to review the Ninth Circuit's holding that the CWA regulates point-source discharges that reach navigable waters via groundwater, Kinder Morgan Energy Partners was petitioning the Supreme Court to review the Fourth Circuit Court of Appeal's ruling on the same issue in *Kinder Morgan Energy Partners, L.P. v. Upstate Forever*, No. 17-1640. To prepare for a possible grant of certiorari in either or both cases, it was necessary for me and other Earthjustice attorneys to keep abreast of developments in the *Kinder Morgan* case. It was also necessary for Plaintiffs' counsel to communicate and coordinate strategy with lawyers from the Southern Environmental Law Center ("SELC"), who represented the plaintiffs in *Kinder Morgan*, both before and after the grant of certiorari in this case. Defendant is simply wrong in claiming that the work that I and other Earthjustice lawyers performed involving the *Kinder Morgan* case was "non-essential work on unrelated litigation."

26.    When I started drafting my opposition to Defendant's certiorari petition, the Ninth Circuit and Fourth Circuit were the only courts of appeals that had issued decisions directly addressing whether the CWA regulates point-source discharges that reach navigable waters via groundwater, with both courts agreeing with Plaintiffs that the CWA can regulate such discharges. Accordingly, I devoted a significant portion of my initial drafts of Plaintiffs' opposition brief to explaining

8

why Defendant was incorrect in claiming that there was a circuit split that the Supreme Court needed to resolve.

27.    On September 24, 2019, nearly a month into the process of drafting Plaintiffs' brief opposing certiorari, the Sixth Circuit Court of Appeals issued two decisions—*Tenn. Clean Water Network v. Tenn. Valley Auth.*, 905 F.3d 436 (6th Cir. 2018), and *Ky. Waterways All. v. Ky. Utils. Co.*, 905 F.3d 925 (6th Cir. 2018)—that created a more direct conflict among the circuits on whether the CWA regulates discharges via groundwater. This major change in the legal landscape required me to expend significant additional time after September 24, 2018, on substantial revisions of the nearly completed opposition brief to explain why, notwithstanding this recent, shallow circuit split, the Supreme Court should still deny review.

28.    Defendant claims that time I spent monitoring developments in the Sixth Circuit cases constitutes "non-essential work on unrelated litigation." As mentioned, these cases were closely related to this one, as Defendant argued to the Supreme Court that they created a circuit split necessitating review.

29.    On December 3, 2018, the Supreme Court issued an order requesting the Solicitor General to provide his views on whether the Court should grant Defendant's petition for certiorari. On December 6, 2018, I received an email from the Office of the Solicitor General inviting me to a meeting on December 10, 2018,

9

to discuss the position that the United States should take in its brief. When I

received the invitation, I consulted experienced Supreme Court practitioners,

including Mr. Nelson (who had not yet joined Plaintiffs' litigation team) and

Stanford Law School Professor Jeffrey Fisher to determine whether I should fly

from Honolulu to Washington, D.C., to appear at the meeting in person. I was told

that, as lead counsel, my in-person attendance was essential to represent Plaintiffs'

interests. Attached hereto as Exhibit 11 are true and correct copies of the travel

expenses for this trip that Plaintiffs seek to recover, with confidential personal

information redacted.

30.    After the Supreme Court granted certiorari, Plaintiffs increased their

efforts to convince the County of Maui's elected officials to settle the case and

focus on fixing the injection wells, instead of continued litigation. As lead counsel,

I had limited time for such efforts; my primary responsibility was to prepare our

arguments for the Supreme Court. However, given the importance of seeking a

negotiated settlement, I made time to participate in the settlement outreach, to the

extent I could.

31.    On April 23, 2019, I traveled to Maui to attend a Maui County

Council meeting that was considering a resolution calling for settlement of this

case. After I offered my oral testimony, then-Council Chair Kelly King asked me

to serve as a resource person at the meeting to respond to any questions the

councilmembers might have, which I did. Attached hereto as Exhibit 12 are excerpts from a true and correct copy of the minutes of the Maui County Council's April 23, 2019, meeting, which are available at https://mauicounty.legistar.com/View.ashx?M=M&ID=689866&GUID=FF306154-FF38-48B0-A691-6698089CC7D4 (last visited September 27, 2021).

32.    Defendant has claimed that my testimony at the Maui County Council meeting was "improper *ex parte*" lobbying. Putting aside the First Amendment concerns implicated by Defendant's claim, it is factually incorrect. The minutes of the Council meeting make clear that then-Deputy Corporation Counsel Ed Kushi was in attendance.

33.    On May 20, 2019, I again traveled to Maui to attend and testify at the meeting of the Maui County Council's Government, Ethics, and Transparency ("GET") Committee. I attended this meeting at the invitation of Committee Chair Michael Molina, who asked Earthjustice to make a presentation to inform the committee's deliberations about whether to settle this case. Attached hereto as Exhibit 13 is a true and correct copy of the May 15, 2019, letter from Chair Molina inviting Earthjustice to make a presentation.

34.    Again, while Defendant claims that my presentation at the GET Committee meeting was improper *ex parte* lobbying, both Mr. Kushi and Deputy Corporation Counsel Richelle Thomson attended the meeting, with Ms. Thomson

11

also making a presentation. Attached hereto as Exhibit 14 are excerpts from a true and correct copy of the minutes of the May 20, 2019, meeting of the Maui County Council's GET Committee. These minutes are available at https://mauicounty. legistar.com/View.ashx?M=M&ID=694102&GUID=94188F93-E380-4E46-9C0B-9338BA6A2CE7 (last visited September 27, 2021).

35.     Attached hereto as Exhibit 15 are true and correct copies of the travel expenses for my trip to attend the May 20, 2019, GET Committee meeting, with confidential personal information redacted. Although my one-way fare to Kahului was $158.36, I was able to use credits for a previously booked ticket, so Plaintiffs seek to recover only $90.34 in airfare for this trip.

36.      On May 23, 2019, I returned to Maui to attend the continuation of the GET Committee's meeting regarding settlement. While Defendant claims my activities there were *ex parte*, Mr. Kushi, Ms. Thomson, and Deputy Corporation Counsel Brian Bilberry all attended the meeting. Attached hereto as Exhibit 16 are excerpts from a true and correct copy of the minutes of the GET Committee's May 23, 2019, meeting. These minutes are available at https://mauicounty.legistar .com/View.ashx?M=M&ID=694879&GUID=204D2163-467B-48B8-8467-9BC8DD461C8F (last visited September 27, 2021).

37.     On July 7, 2020, the GET Committee once again held a meeting to discuss possible settlement. Due to the COVID pandemic, the meeting was

12

conducted online only, so I testified via telephone and videoconferencing. At the

meeting, Chair Molina once again asked me to serve as a resource person, which I

did. Attached hereto as Exhibit 17 are excerpts from a true and correct copy of the

minutes of the GET Committee's May 23, 2019, meeting, which are available at

https://mauicounty.legistar.com/View.ashx?M=M&ID=796328&GUID=C8B507B

D-F706-48AC-8A6D-CC287E451526 (last visited September 24, 2021).

38.    Once again, while Defendant claims my testimony at the GET

Committee meeting was *ex parte* communication, the minutes make clear that

Corporation Counsel Moana Lutey and Deputy Corporation Counsel Richelle

Thomson and Brian Bilberry attended the meeting.

39.    After receiving Defendant's opening brief on the merits to the

Supreme Court, I participated actively in drafting Plaintiffs' answering brief.

Having served as lead attorney since this case was first filed in this Court in 2012,

my involvement was necessary, as I was the only person with institutional

knowledge on the brief-writing team, which included Scott Nelson as lead drafter,

Sambhav Sankar, Earthjustice's Senior Vice-President of Programs, who has

significant Supreme Court expertise, and Janette Brimmer, who has broad

experience litigating CWA cases. Given that I was going to present Plaintiffs'

arguments to the Supreme Court, it was also essential for me to be both thoroughly

familiar with all the nuances of our position and completely comfortable with the

13

approach we were taking. Accordingly, once Mr. Nelson completed his initial draft in mid-June 2019, I was deeply involved in every revision until the answering brief was finalized just before filing on July 12, 2019.

40.     On September 20, 2019, about six weeks before oral argument was scheduled before the Supreme Court, the Maui County Council voted to settle the case. This was a significant development that I and Plaintiffs' other counsel agreed was essential to communicate to the Supreme Court, which, in similar situations, has continued oral argument to see if cases resolved without the need to expend the Court's limited resources on them. I reached out to Elbert Lin, lead counsel for Defendant during the Supreme Court proceedings, and to Corporation Counsel to inquire if Defendant intended to inform the Court and was told that it would not. Accordingly, on October 3, 2019, Plaintiffs filed a letter with the Supreme Court to alert the Court to the Maui County Council's resolution to settle.

41.     While Defendant claims that Plaintiffs' efforts to keep the Supreme Court apprised of potential settlement constituted "improper *ex parte* communication" with the Court, no *ex parte* communication occurred; Plaintiffs served their letter on Defendant. Attached hereto as Exhibit 18 is a true and correct copy of the FedEx receipt for serving this letter on Mr. Lin, Defendant's Supreme Court counsel, with confidential account information redacted. Attached hereto as Exhibit 19 is a true and correct copy of the expense report for the taxi charges that

14

then-Earthjustice litigation assistant Nicolas Thorpe incurred in hand-delivering this letter to the Supreme Court for filing.

42.     Prior to this case, I had never argued before the United States Supreme Court. To adequately represent Plaintiffs before the Nation's highest court required extensive preparation, not all of which is reflected on Exhibit 1. For example, as previously mentioned, to familiarize myself with the nuances of practice before the Supreme Court, I traveled to Washington, D.C., to observe the Court during one of its sittings in March 2020. While this trip was invaluable to my preparation, in the exercise of billing discretion, Plaintiffs are not seeking to recover for this trip, or for scores of other hours spent in preparation.

43.     On the advice of Mr. Nelson and Mr. Fisher, both experienced Supreme Court practitioners, after an initial "internal" moot organized by Earthjustice, I participated in three "external" moots to prepare for the Supreme Court: at the Stanford Supreme Court Litigation Clinic, the Georgetown University Law Center's Supreme Court Institute, and Public Citizen. These moots were essential to my preparation for the (ultimately successful) Supreme Court argument. During the Stanford moot, I came up with the analogy that crystalized Plaintiffs' theory of the case ("we say that eggs come 'from the store,' not the car, even though that's the last place they were before entering the house"). In subsequent moots, I was able to market test that analogy, as well as my responses

to other challenging questions, with numerous experienced Supreme Court practitioners. The analogy featured prominently in my opening comments to the Supreme Court, and the answers that were honed over the course of these moots ultimately persuaded the Court to rule in Plaintiffs' favor. None of that benefit would have been secured had I spent only 40 hours practicing in the privacy of my office, as Defendant alleges is all that would be reasonable.

44.    On October 20, 2019, I traveled from Honolulu to San Francisco to participate in the Stanford moot, which took place on October 23, 2019. I arrived in San Francisco a couple of days early so I could adjust to the time change and be able to get the full benefit of the Stanford moot, where, for the first time, I was questioned by a panel of experienced Supreme Court practitioners. During the days in San Francisco, I worked out of Earthjustice's headquarters, preparing for the moot.

45.    The day after the Stanford moot, I flew to New York City, so I could start adjusting to East Coast time and could prepare for my next moot, at Georgetown University Law Center's Supreme Court Institute, which took place on October 30, 2019. I stayed with family in New York City, which avoided lodging expenses for the two nights I spent there. The airfare from San Francisco to New York City was cheaper than flying to Washington, D.C., even factoring in the $16.25 I spent on the bus from New York, and the flight time to New York

City was comparable to flying to Washington. Plaintiffs do not seek to recover for the time I spent on the bus from New York City to Washington, D.C.

46.    Attached hereto as Exhibit 20 are true and correct copies of the travel expenses that Plaintiffs seek to recover for my travel from Honolulu to Washington D.C., via San Francisco and New York City, as well as my lodging in Washington, D.C., from October 26 to November 3, 2019, with confidential personal information redacted.

47.    The Supreme Court heard argument in this case on November 6, 2019. The argument lasted slightly longer than an hour. Because I represented respondents, my argument followed Defendant's opening argument by Mr. Lin, as well as the argument of Deputy Solicitor General Malcolm Stewart, who represented the United States as amicus curiae. I did not stand at the podium to address the Court until nearly thirty minutes into the argument.

48.    While Defendant does not object to the costs associated with my return travel to Honolulu following the Supreme Court argument, Defendant does object to the time, claiming that it was excessive and unrelated to this litigation. Because I live in Honolulu, flying home after the argument was directly related to this case. And the fact that I stopped in Seattle on the way home did not add to the time that Plaintiffs seek to recover. Even without a stop-over, flying to Hawai'i from Washington, D.C., typically involves multiple changes of planes, with the

17

associated time spent in each airport, particularly for the less expensive tickets that public-interest attorneys favor. Plaintiffs do not seek to recover any of the personal time that I spent in Seattle prior to continuing my travel back to Honolulu.

49.     After the Supreme Court issued its decision, I contacted Mr. Lin to seek Defendant's agreement to split taxable costs. I noted that, while the Supreme Court ordinarily taxes costs in favor of the petitioner (here, Defendant) when it vacates and remands, in this case the Court had resolved the disputed issue— whether the CWA regulates any point-source discharges that reach navigable waters via groundwater—in Plaintiffs' favor. Defendant's agreed, and, on May 4, 2020, Plaintiffs filed an unopposed motion to tax costs in this manner. Attached hereto as Exhibit 21 is a true and correct copy of the May 26, 2020, correspondence from Supreme Court Clerk Scott Harris, communicating that the Court's decision to split taxable costs. This document is also on file with this Court as ECF No. 282.

50.     Defendant objects to many of my time entries for work in the Supreme Court on the grounds that my communications were with "non-clients." To represent Plaintiffs effectively and secure a successful outcome, it was necessary for me to communicate with many individuals and organizations that were not my clients, including, but not limited to, attorneys at SELC (as discussed above), Supreme Court advocates who provided invaluable guidance (*e.g.*, Mr.

Fisher), and potential amici. In addition, some of the individuals who Defendant

flags as "non-client" are my colleagues at Earthjustice, who assisted with the

briefing and preparation for argument before the Supreme Court, including Vice

Presidents of Litigation Drew Caputo (who assisted extensively with argument

preparation) and Patrice Simms (who assisted at my meeting with the Solicitor

General). In the exercise of billing discretion, Plaintiffs do not seek to recover for

the substantial time that these other Earthjustice attorneys devoted to this case.

51.    Given the large number of individuals and organizations that I needed

to consult while working on the Supreme Court phase of this case, I occasionally

needed to use MeetingOne conferencing service to host telephone calls.

MeetingOne was the conference calling capability used by the Honolulu office of

Earthjustice at the time.

52.    Plaintiffs seek reimbursement for the costs associated with the

following conference calls: (1) two calls on September 28, 2018 with members of

Plaintiff Sierra Club to discuss our strategy for opposing Defendant's petition for

certiorari; (2) a March 4, 2019 call with Earthjustice attorneys to discuss the

limiting principles applicable to Plaintiffs' interpretation of the CWA's application

to discharges via groundwater; (3) an April 17, 2019 call with representatives of

our clients to discuss the terms of possible settlement with Defendant; (4) a May

16, 2019 call with SELC attorneys to discuss the limiting principles applicable to

19

Plaintiffs' interpretation of the CWA's application to discharges via groundwater; and (5) a November 13, 2019 call with representatives of our clients following the Supreme Court argument to discuss the terms of possible settlement with Defendant. Attached hereto as Exhibit 22 are true and correct copies of the MeetingOne invoices for these calls, with confidential personal information and information related to other clients redacted.

53.    On remand to this Court, to address the factors the Supreme Court identified as potentially relevant to liability, we initially retained two experts who had provided voluminous testimony during the earlier round of litigation before this Court in the form of expert reports, deposition testimony and declarations: Dr. Jean Moran, a Professor in the Department of Earth & Environmental Sciences at California State University East Bay, and Dr. Adina Paytan, a research scientist at the Institute of Marine Sciences, University of California, Santa Cruz. As Dr. Moran and Dr. Paytan had previously offered opinions on nearly all the Supreme Court's factors, preparing their expert reports required a thorough review of the hundreds of pages of testimony they had already provided to extract the salient details.

54.    The deadline for Plaintiffs' initial expert reports was November 30, 2020, near the end of the fall semester, when Dr. Moran and Dr. Paytan had limited time available due to teaching and research obligations at their respective

20

universities. Accordingly, I assisted them to comb through their prior testimony and to prepare drafts of their reports. The opinions, analysis, and supporting information that went into each of their reports was entirely theirs, and they both reviewed and revised each draft of their report thoroughly to ensure its accuracy.

55.    I spent a total of 27.8 hours assisting Dr. Moran with drafting her November 30, 2020, report. In addition, I spent time corresponding with Dr. Moran via email and telephone regarding this report. Exhibit B to the Joint Statement, which Defendant prepared, appears to include 5.1 hours of this correspondence time, which was not spent on drafting, in the total time spent "revising" Dr. Moran's initial report.

56.    I spent a total of 17.1 hours assisting Dr. Paytan with drafting her November 30, 2020. I spent an additional 0.6 hours corresponding with Dr. Paytan via email and telephone regarding this report, which Defendant's Exhibit B again appears to count as time spent "revising."

57.    To rebut the expert reports that Defendant served on November 30, 2020, which challenged aspects of the modeling that was performed as part of the Lahaina Tracer Dye Study, Plaintiffs retained as an expert Robert Whittier, a geologist at the Safe Drinking Water Branch of the Hawai'i Department of Health. Mr. Whittier was a co-author of the Lahaina Tracer Dye Study and was primarily responsible for the challenged modeling effort.

21

58.    Mr. Whittier had never previously served as an expert witness in litigation and, therefore, had no prior experience preparing expert reports. To ensure that Mr. Whittier's report would comply with the legal requirements, I had to spend 3.1 hours on the telephone with Mr. Whittier to familiarize him with the process, time that Defendant's Exhibit B attributes to time "revising" his December 30, 2020, rebuttal report.

59.    I spent a total of 18.4 hours reviewing Mr. Whittier's rebuttal report and assisting with revisions, with a significant focus on ensuring that his report satisfied Plaintiffs' disclosure obligations. All the opinions expressed in the report and the bases for those opinions are solely Mr. Whittier's.

60.    The thirty-day period for Plaintiffs' experts to prepare rebuttal expert reports fell between Thanksgiving and New Year's Eve, with the deadline to serve those reports on December 30, 2020. Both Dr. Moran and Dr. Paytan had competing professional commitments for the end of the school semester. To ensure we could meet the Court's deadline notwithstanding the experts' limited availability, I assisted them in preparing their rebuttal reports, spending 18.5 hours revising Dr. Moran's report and 24.3 hours revising Dr. Paytan's report. As with their initial reports, both experts were actively involved in the preparation of their rebuttal reports and ensured that the final reports accurately reflected their opinions and the bases for those opinions.

61.    Defendant's Exhibit B includes in its total for time "revising" expert reports 1.5 hours that I spent on the telephone and communicating via email with Dr. Moran about her rebuttal report and 2.1 hours that I spent similarly communicating with Dr. Paytan about her rebuttal report.

62.    On January 15, 2021, after the deadline for rebuttal expert reports, Defendant served a supplemental rebuttal report from Dr. Jeffrey Thompson, which expressed new critiques of the Lahaina Tracer Dye Study modeling that Mr. Whittier had prepared. Rather than spend time on motion practice seeking to strike Dr. Thompson's report, I negotiated with Mr. Bilberry for the opportunity for Mr. Whittier to prepare a supplemental report to respond to Dr. Thompson. I spent an additional 16.9 hours assisting Mr. Whittier with revisions to this supplemental report. All the opinions and other information in the supplemental report were Mr. Whittier's.

63.    Defendant's Exhibit B includes in the total for time "revising" expert reports an additional 2.8 hours that I spent on the telephone with Mr. Whittier discussing his report.

64.    The supplemental reports from Dr. Thompson and Mr. Whittier revealed issues with some of the modeling on which Dr. Moran had relied as additional support for some of the opinions she had expressed in her initial and rebuttal reports. I informed Dr. Moran that, pursuant to Federal Rule of Civil

23

Procedure 26(e)(2), she was obliged to supplement her prior reports to discuss whether this new information affected her analysis. I spent a total of 5.3 hours assisting Dr. Moran in preparing this supplemental report.

65.    Attached hereto as Exhibit 23 are excerpts from a true and correct copy of the deposition of Defendant's expert, Dr. Jeffrey Muir Thompson, which was taken on February 5, 2021. This exhibit includes excerpts from a true and correct copy of Deposition Exhibit 7, which is Dr. Thompson's resume.

66.    Attached hereto as Exhibit 24 are excerpts from a true and correct copy of the November 30, 2020, expert report prepared for Defendant by Richard Kraft, Dr. Ryan Fimmen, and Dr. Jeffrey Thompson of Geosyntec Consultants. Defendant served this report on Plaintiffs as part of expert discovery in this case.

67.    At the December 4, 2020, status conference with Magistrate Judge Kenneth J. Mansfield, the parties agreed to exchange the production of expert discovery on January 8, 2021. Both associate attorney Mahesh Cleveland (who joined the litigation team for the proceedings on remand) and I worked with our three experts—Dr. Moran, Dr. Paytan, and Mr. Whittier—to ensure that Plaintiffs complied fully with their expert disclosure obligations. The production was voluminous, with nearly 740,000 Bates-stamped pages of documents ultimately produced. We had to review that production carefully to ensure that no privileged communications were inadvertently disclosed. As an associate attorney, Mr.

24

Cleveland took the first pass with respect to a portion of the production, flagging documents to be withheld or redacted. As the supervising attorney, I reviewed his work. This team effort was essential in order for Plaintiffs to get this massive task completed properly under extreme time pressure; the work had to be done over the New Year's holiday, with the deadline for the production only ten days after the deadline to serve Plaintiffs' rebuttal expert reports.

68.    In connection with the expert production, I also had to draft Plaintiffs' claims of privilege and protection in response to the subpoena duces tecum that Defendant served on each of our three experts.

69.    Defendant served their expert discovery in three batches, with an initial production on January 8, 2021 (per the parties' agreement), a supplemental production from Defendant's expert Dr. E. John List on January 12, 2021 (of documents left out of his earlier production), and a third production in connection with the supplemental report from Dr. Thompson on January 15, 2021. All told, Defendant's expert production consisted of over 2,000 documents, with nearly 78,000 pages.

70.    After receiving Defendant's production, I carefully reviewed it. Depositions of Defendant's experts were scheduled to begin in only about two weeks, so I had to examine the production to identify the documents I wanted to use in my upcoming deposition questioning. I also organized the documents as I

25

reviewed them, so that I could later locate potentially favorable documents for use at summary judgment or trial.

I declare under penalty of perjury that I have read the foregoing declaration and know the contents thereof to be true of my own knowledge.

DATED:  Honolulu, Hawai'i, September 27, 2021.


/s/ David L. Henkin
David L. Henkin

26