DAVID L. HENKIN        #6876
MAHESH CLEVELAND       #11023
EARTHJUSTICE
850 Richards Street, Suite 400
Honolulu, Hawai‘i 96813
Telephone No.: (808) 599-2436
Fax No.: (808) 521-6841
Email:  dhenkin@earthjustice.org
        mcleveland@earthjustice.org

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF HAWAI‘I

| | |
|---|---|
| HAWAI‘I WILDLIFE FUND, a Hawai‘i non-profit corporation, SIERRA CLUB - MAUI GROUP, a non-profit corporation, SURFRIDER FOUNDATION, a non-profit corporation, and WEST MAUI PRESERVATION ASSOCIATION, a Hawai‘i non-profit corporation,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>COUNTY OF MAUI,<br><br>　　　　Defendant. | CIVIL NO. 12-00198 SOM KJM<br><br>DECLARATION OF SCOTT L. NELSON |

DECLARATION OF SCOTT L. NELSON

I, SCOTT L. NELSON, declare that, if called as a witness in this action, I could testify of my own personal knowledge under penalty of perjury that:

1.    I served as co-counsel for Plaintiffs Hawaiʻi Wildlife Fund, Sierra Club–Maui Group, Surfrider Foundation, and West Maui Preservation Association in the Supreme Court of the United States in *County of Maui v. Hawaiʻi Wildlife Fund, et al.*, No, 18-260. I submit this declaration in support of Plaintiffs' claim for legal fees based on my work in the case.

2.    I graduated from Harvard Law School in 1984. From 1984 to 1986, I was a law clerk to Associate Justice Byron R. White of the Supreme Court of the United States.

3.    I am a member of (among others) the bars of the District of Columbia and the Supreme Court of the United States.

4.    I am employed as an attorney by Public Citizen Litigation Group, a nonprofit public-interest law practice that is part of the organization Public Citizen Foundation, Inc., located in Washington, DC. Before joining Public Citizen in 2001, I practiced with the Washington, DC, law firm Miller, Cassidy, Larroca & Lewin. I joined the firm in the fall of 1986 and became a partner in 1991.

5.    A major focus of my work over the past three decades has been Supreme Court practice. Beginning in my fourteen years of law-firm practice and increasingly during my twenty years at Public Citizen Litigation Group, I have

regularly represented parties and amici curiae before the Supreme Court either as counsel of record or as part of a team of attorneys. In many of the latter cases, although not designated as counsel of record, I have served as the principal drafter of briefs at the certiorari or merits stage. Whether listed as counsel of record or not, I have been the principal author of dozens of briefs in opposition to petitions for writs of certiorari and a smaller number of petitions for writs of certiorari, dozens of amicus curiae briefs at the certiorari and merits stages of cases, and approximately ten merits briefs for parties. I have played a substantial role in the drafting and editing of many more merits briefs for parties and amici curiae. I have argued four cases myself.

6.    I was retained as co-counsel following the Supreme Court's grant of certiorari in February 2019. Public Citizen is a non-profit, 501(c)(3) organization that provides pro bono representation to clients. Accordingly, I did not charge Plaintiffs for the time I spent litigating this case.

7.    My role in the case was to take principal responsibility for the preparation of Plaintiffs' merits brief in the case, and to assist counsel of record, David Henkin of Earthjustice, in preparing to argue the case. My specific tasks were to generate an outline of the brief, prepare an initial draft for circulation to co-counsel, integrate their suggestions and edits in the draft as well as making further revisions to the draft, and finalize the brief for submission to the printer.

2

Thereafter, I participated in telephone conferences and emails with Mr. Henkin and his Earthjustice colleagues, participated in moot courts, and assisted Mr. Henkin at the Supreme Court argument.

8. I have reviewed and approved the time set forth in Exhibit A, which accurately reflects the time I spent on these tasks. As these records reflect, I performed the task of preparing the brief itself in May, June, and early July of 2019, leading up to the filing of the brief on July 12, 2019. The remaining time I recorded was for assisting Mr. Henkin in preparation for argument.

9. Specifically, the drafting of the brief was my principal, though not exclusive, professional activity for the approximately two-week period from May 30, 2019, through June 13, 2019. During that time, I produced a complete and polished first draft containing all of the sections of the final brief except the summary of argument; received an initial set of comments from Mr. Henkin; and prepared a revised version. That initial drafting process, as my records show, took approximately 60 hours. In my experience that is a reasonable amount of time for the creation of a complete draft of a 15,000-word brief, including recitation of the relevant facts and supporting citations, and an argument with the supporting authorities marshalled and cited.

10. After circulation of the initial draft, I was out of the country for a little over two weeks while co-counsel reviewed, commented on, and made suggested

revisions to the draft. I returned approximately ten days before the brief was due and devoted the majority of my working time to the completion of the draft taking those comments and suggestions into account. That process involved email and telephone exchanges with co-counsel, the reconciliation of a variety of comments reflecting different points of view on specific issues and emphases in the brief, and considerable rewriting. That work was time-consuming for all of the attorneys working on the brief and involved the exercise of careful judgment with respect to the incorporation of specific editorial suggestions as well as the creation of new text to incorporate points made in comments. The approximately 60 additional hours I spent in that process was in my view essential to the completion of a finished and fully satisfactory brief.

11.    Based on my experience over my years of practice, it is my judgment that placing principal responsibility for the drafting and polishing of a Supreme Court brief in the hands of an experienced Supreme Court advocate is essential to the presentation of an effective brief, which is among the most important determinants of the outcome of a case in the Supreme Court. If that lawyer is involved in the drafting from start to finish, the result is likely to be a more coherent brief as well as one prepared more efficiently. I believe that the time I spent doing that work in this case was spent cost-effectively and was essential to the successful outcome of the case.

12.     During the same period of time when I was working on the brief, two

of my co-counsel, Mr. Henkin and Mr. Sambhav Sankar (a senior Earthjustice

attorney), recorded significant time working on the drafting of the brief. I have

reviewed the records of their hours for that time, and I believe they are reasonable

in light of the contributions both made to the brief and the amount of time a team

of attorneys would, in my experience, normally spend in creating a brief of the

quality expected in a Supreme Court case.

13.     Mr. Henkin's time spent in work on the drafting of the brief totaled a

little over 100 hours in June and early July. As the lead counsel throughout the

case and the attorney who would argue it in the Supreme Court, he needed to be

thoroughly comfortable with the argument as presented in the brief and intimately

familiar with it, so his participation throughout the drafting process was essential.

In addition, because he had been involved in the case throughout, he had a wealth

of knowledge of the facts and the legal issues and therefore a great deal to

contribute to the drafting process. Our work on the brief was highly collaborative

and iterative: Mr. Henkin engaged in multiple reviews of successive versions of the

brief (or parts of the brief) and made detailed comments and editorial suggestions

on each, which provided invaluable assistance to me as I prepared further drafts. In

my experience that process is typical in the preparation of Supreme Court briefs,

which usually reflect substantial input from multiple attorneys who are genuinely

5

co-authors with the principal drafter of the brief rather than merely acting as reviewers or editors. The time Mr. Henkin recorded is consistent with the extensiveness of the comments and suggestions he provided during the drafting process, and his work was essential to the quality of the finished brief.

14.    Mr. Sankar's hours are less substantial, amounting to approximately 30 hours that were part of the drafting process, but his input was significant. Given his position and background, including significant Supreme Court experience, Mr. Sankar focused on strategic issues and framing of the argument, and the time he spent reviewing the brief, commenting, and making editorial suggestions sharpened its focus and contributed very substantially to the finished product.

15.    Following the completion of the briefing, the remainder of my time, spent assisting Mr. Henkin in preparing for argument, participating in moot courts, and attending argument, was also reasonably expended in tasks critical to the successful outcome of a case in the Supreme Court. Oral argument before the Supreme Court is a daunting endeavor and requires extensive preparation by the advocate, including discussion with colleagues of how best to convey the arguments made in the brief, and how to respond to likely questions from the Justices. Most advocates (not just those who, like Mr. Henkin, are arguing to the Court for the first time) schedule multiple moot courts in order to prepare for the argument, with three or four (the number in this case) being the norm. Participation

6

in, or attendance at, those moot courts by other key members of the team of attorneys is essential to provide feedback for the advocate on responses to questions, adjustments in argument strategy, and how to deal with new legal or factual issues that arise in the moot courts.

16.    In this case, it was also important for me to be in Washington, DC with Mr. Henkin during the week before argument, as I spent several hours on most of those days meeting with him and with other members of the team at times that worked best for him. I also attended one of his moot courts during that time (at the Georgetown University Law Center's Supreme Court Institute) and participated as a "Justice" in another at Public Citizen, both of which were facilitated by my presence in Washington. Had I not been in Washington during that time, I would not have been as readily available to him when needed and our communications would not have been as effective.

17.    Finally, as to my presence at argument, it is customary for arguing counsel to be accompanied at counsel table by two or three colleagues who have been most extensively involved in the briefing and preparation of the case. In this argument, I wrote Mr. Henkin notes during the presentations by opposing counsel that he used in his argument, and I also was the point person for collecting and providing him written input from others at counsel table. I also was available to

7

provide him with any of the written materials in the case that might be needed during the course of argument.

18.    The approximately 35 hours I spent assisting Mr. Henkin in preparation for and at argument—including my physical presence in Washington, DC—were reasonably expended, consistent with normal Supreme Court practice, and important to the ultimate outcome.

19.    In sum, I believe that all of the time shown in my billing records was reasonably necessary for performance of my role in the case. In the exercise of billing judgment, I did not record time spent on various other tasks, including many telephone calls, background reading to familiarize myself with the case, and reviewing emails. My estimate, based on review of my calendar and emails, is that the time I did not record—for which Plaintiffs do not seek recovery—amounted to dozens of hours.

20.    On October 29, 2019, I traveled from my home in Oregon (from which I regularly telecommute to my DC office) to Washington, DC, to assist Mr. Henkin in the week leading up to the Supreme Court argument and to attend the November 6, 2019, argument as second chair. I returned home immediately following the argument. I was able to stay with a friend for three nights of my time in Washington to avoid hotel expenses.

8

21.    Attached hereto as Exhibit 36 is a true and correct copy of the Alaska

Airlines confirmation for my air travel, with personal information redacted.

22.    Attached hereto as Exhibit 37 is a true and correct copy of the receipt

for my first night's hotel in Washington, DC, with the reservation number

redacted.

23.    Attached hereto as Exhibit 38 is a true and correct copy of the

confirmation email from Kimpton Hotels for my final four nights of lodging at the

Kimpton Topaz Hotel in Washington, DC, with personal information redacted.

24.    Attached hereto as Exhibit 39 are excerpts from a true and correct

copy of my November 24, 2019, Visa credit card statement showing payment of

$903.47 for the four nights I stayed at the Kimpton Topaz Hotel, with personal

information redacted.

25.    I have also reviewed Mr. Henkin's time spent on certain tasks before

the Supreme Court's grant of certiorari, including the preparation of the brief in

opposition to the petition for a writ of certiorari, supplemental briefs, and a

meeting with the Office of the Solicitor General of the United States. My own

practice is heavily focused on handling cases in the Supreme Court at the petition

stage, and I have drafted dozens of briefs in opposition to petitions and participated

in meetings with the Office of the Solicitor General at this stage in a case. In my

judgment, based on that experience, Mr. Henkin's hours at the certiorari-stage of the case were reasonable.

26.    I am very familiar with the work Mr. Henkin performed at the certiorari-stage because, prior to being retained to serve as co-counsel, I consulted informally with Mr. Henkin and provided advice on how best to respond to the petition. I did not record the time I spent on this stage of the Supreme Court proceedings, and Plaintiffs are not seeking recovery for this time.

27.    The preparation of a brief in opposition is a critically important task for any attorney seeking to defend a favorable result in the lower courts and one that requires careful and nuanced drafting. Preparing a brief in opposition is difficult because, unlike a typical brief, its focus is not which side is correct on the merits, but whether the case merits the Supreme Court's attention, which involves a multitude of considerations of which the correctness of the result below is only one, and usually not the most important one. But even while maintaining a broad focus on whether the case merits review, the brief must also, to avoid waiver, address any material factual errors in the petition for certiorari and identify all legal arguments that could result in affirmance of the decision below without the need to resolve the question presented. As a result, preparation of a brief in opposition can be a time-consuming process.

28.    The work in opposing certiorari was particularly complicated in this case because the County of Maui's petition focused both on the correctness of the decision below and on claimed indirect conflicts among the circuits. Opposing such a petition requires careful analysis of the cited cases to demonstrate the absence of conflict, as well as a response to the arguments based on correctness of the decision below that strikes an appropriate balance between responding to the petition's arguments and not appearing to invite a decision on the merits. However, on September 24, 2019, after Mr. Henkin had already spent approximately 60 hours in connection with preparing a brief in opposition with that focus, the Sixth Circuit Court of Appeals issued a pair of decisions that created a more direct conflict among the circuits, requiring Mr. Henkin to revise the brief in opposition substantially to give it a radically different emphasis on why the newly arisen division among the circuits did not require review in light of other considerations. In effect, the timing required Mr. Henkin to prepare two different briefs in opposition reflecting the significantly different situations before and after September 24. In my judgment, the time Mr. Henkin spent in the briefing process at the certiorari-stage was reasonable in light of the complexity of the issues as posed in the original petition and the further complicating factor of a late-arising conflict among the circuits.

11

29.     Mr. Henkin's work at the certiorari-stage also included travel to Washington, DC, and attendance at a meeting with the Office of the Solicitor General following the Supreme Court's request for a brief stating the views of the United States on whether the petition should be granted. It is customary to meet with the Solicitor General's Office in such circumstances to present arguments for why the United States should support one's position in the case. Indeed, it would be highly unusual, and professionally irresponsible, for counsel for a party to decline to meet with the Solicitor General's Office in light of the influence the Office's recommendations have on the Court's decisions whether to hear cases. Participation in such meetings also requires significant preparation, as the attorneys from the Solicitor General's Office expect counsel for parties to be able to address not only all the circumstances bearing on whether the case is one the Supreme Court should review, but also the merits of the legal issues presented and the extent to which those issues implicate interests of the federal government.

30.     At the time of the meeting in this case, before the pandemic, the expectation of the Solicitor General's Office was that principal counsel for parties would attend such meetings in person. Although the Solicitor General's Office would, if asked, allow additional counsel to listen in to such meetings by telephone, in-person appearance by lead counsel for a party was the norm. I do not recall any such meeting in which I participated prior to the pandemic in which lead

counsel participated remotely. In several cases, I have traveled to Washington, DC, solely to participate in such meetings because of the strong expressed preference of the Solicitor General's Office that attorneys expecting to say anything more than a few words in the meetings be present in person. Moreover, it would have been difficult at that time to participate fully in such a meeting without traveling to Washington. Prior to the pandemic (during which remote videoconferences with the Solicitor General's Office have become the norm for the first time), I had on a few occasions participated in meetings with the Office by telephone in cases where I was not the principal attorney. I found that the conference calling facilities in the Solicitor General's conference room made it hard to hear all participants in the meeting and awkward for an attorney participating by phone to contribute anything substantial to the discussion; indeed, in at least one such meeting I was cut off during a significant part of the meeting. In short, at the time of the meeting in this case, it was customary and expected practice for lead counsel for a party to participate in such a meeting in person, and attempting to participate by telephone would have significantly impaired counsel's ability to participate in this important event. Mr. Henkin's hours spent in attending and preparing for the meeting, and his travel expenses, were reasonably incurred.

\\

\\

13

I declare under penalty of perjury that I have read the foregoing declaration and know the contents thereof to be true of my own knowledge.

DATED:  Ashland, Oregon, September 23, 2021.

SCOTT L. NELSON