IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| HAWAI`I WILDLIFE FUND, a Hawaii non-profit corporation; SIERRA CLUB-MAUI GROUP, a non-profit corporation; SURFRIDER FOUNDATION, a non-profit corporation; and WEST MAUI PRESERVATION ASSOCIATION, a Hawaii non-profit corporation, | ) ) ) ) ) ) ) ) ) ) ) | CIVIL NO. 12-00198 SOM/KJM ORDER DENYING MOTION FOR RECONSIDERATION |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| COUNTY OF MAUI, | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

**ORDER DENYING MOTION FOR RECONSIDERATION**

I.        **INTRODUCTION.**

        Before this court is the County of Maui's motion seeking reconsideration of the order granting summary judgment. This case is on remand following the Supreme Court's decision holding that the Clean Water Act requires a National Pollutant Discharge Elimination System ("NPDES") permit "when there is a direct discharge [of a pollutant] from a point source into navigable waters or when there is the functional equivalent of a direct discharge." *County of Maui v. Hawaii Wildlife Fund, et al.*, 140 S. Ct. 1462, 1476 (2020).  In its summary judgment ruling, this court agreed with Plaintiffs that the Lahaina Wastewater Reclamation Facility ("LWRF") was required to have an

NPDES permit because the LWRF's discharge of a pollutant was the functional equivalent of a direct discharge into the Pacific Ocean. *See* ECF No. 479 (July 26, 2021). Judgment has been entered in Plaintiffs' favor. *See* ECF No. 480 (July 26, 2021). *See* ECF No. 486.

On August 19, 2021, the County of Maui filed the present motion seeking reconsideration of the summary judgment order and judgment. *See* ECF No. 486. The motion for reconsideration is denied.

Some of the County's arguments are based on statements taken out of context. Those arguments do not suffice to warrant reconsideration.

Most of the County's reconsideration motion is focused on this court's examination of the massive volume of treated sewage (which this court referred to as wastewater) dumped every day by the LWRF into injection wells. In determining that the LWRF's discharge is the functional equivalent of a direct discharge into navigable waters, this court examined each of the seven factors enumerated by the Supreme Court, paying particular attention to the time and distance factors, which the Supreme Court noted would usually be the most important factors. This court found no genuine issue of fact with respect to whether the discharge flowing through groundwater to the Pacific Ocean was the functional equivalent of a direct discharge. In the course of its analysis, this court considered the volume of the

discharge, a factor not listed by the Supreme Court.  The massive volume was relevant to and informed this court's decision, but it was not essential to this court's determination.

The County disagrees with this court as to the weight to be accorded the discharges that can indisputably be detected at the seeps.  Those discharges represent a small percentage of the total discharge that travels through groundwater. Ultimately, all of it makes its way to the Pacific Ocean.  A trial would have provided no greater certainty than is already in the record about precisely when the rest of the discharges (i.e., the discharge not detected at those seeps) reaches the ocean, or where the entry points are.  Given the congressional intent behind requiring NPDES permits, it makes little sense to allow the County to escape liability simply because the record does not and probably could never establish the precise path of the bulk of the wastewater.  At a minimum, the undisputed evidence demonstrates that millions of gallons of wastewater are discharged into the Pacific Ocean from a handful of seeps located about half a mile from the LWRF and that this wastewater begins to emerge into the ocean only 84 days after the LWRF dumps it into the injection wells.  Under these circumstances, the County does not persuade this court to reconsider its conclusion that what is before the court is the functional equivalent of a direct discharge.

Nor is the court persuaded by what appears to be the County's argument in its reconsideration papers that its treated sewage should not be considered a pollutant.  At the hearing on the motion, the County backtracked and conceded that what the LWRF puts into the wells and what emerges in the Pacific Ocean are pollutants for purposes of the Clean Water Act.  The County then seemed to this court to switch back to arguing that the wastewater is not a pollutant.  In any event, to the extent the County is maintaining this argument, it has waived it, having failed to raise it until after this court entered summary against it earlier this year, about nine years after the Complaint in this case was filed.

To the extent the County is arguing that no NPDES permit is necessary because the LWRF's treated sewage undergoes changes before it reaches the ocean (i.e., nitrogen is removed such that less than 100 percent of the nitrogen initially present in the wastewater actually ends up being discharged into the ocean), that argument amounts only to a disagreement with this court's balancing of the seven functional-equivalent factors, which took the nitrogen issue into account.  It does not justify reconsideration.

Finally, this court sees no reason to defer to an agency position that has been withdrawn.

**II.       RECONSIDERATION STANDARD.**

Citing Rule 60(b) of the Federal Rules of Civil Procedure[1] and Local Rule 60.1,[2] the County seeks reconsideration of the order granting summary judgment to Plaintiffs and of the judgment entered in Plaintiffs' favor.  Given the timing of the motion (filed 24 days after the entry of judgment), it may be appropriate to treat the County's motion as one under Rule 59(e) of the Federal Rules of Civil Procedure, which allows a party to ask this court to rectify its own mistakes within 28 days of a final decision.[3]  *See Banister v. Davis*, 140 S. Ct. 1698, 1703 (2020).  Under Rules 4(a)(4)(A)(iv) and 4(a)(4)(A)(vi) of Federal Rules of Appellate Procedure, the timely filing of a Rule 59(e) motion or a Rule 60(b) motion filed no later than 28 days after the judgment is entered suspends the finality of the original order.  *See id.*

Here, it makes no difference whether the court examines the County's reconsideration motion under Rule 59(e) or Rule 60(b), as the motion was filed shortly after the entry of judgment and this court may reconsider its grant of summary

---

[1] To the extent reconsideration is sought based on Rule 60, it appears to be based on an alleged "mistake" or on "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(1) and (6).

[2] Local Rule 60.1 is inapplicable, as it pertains to interlocutory orders.

[3] Rule 59(e) states, "A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment."

judgment under either.  *See Sch. Dist. No. 1J, Multnomah Cty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1262 (9th Cir. 1993); *Ryan v. United States*, 2018 WL 4468403, at *1 (N.D. Cal. Sept. 18, 2018); *White v. Sabatino*, 424 F. Supp. 2d 1271, 1274 (D. Haw. 2006).

A successful motion for reconsideration must accomplish two goals.  First, it must demonstrate some reason that the court should reconsider its prior decision.  Second, a motion for reconsideration must set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision.  *See White*, 424 F. Supp. 2d at 1274; *Na Mamo O'Aha 'Ino v. Galiher*, 60 F. Supp. 2d 1058, 1059 (D. Haw. 1999).  Courts have established three grounds justifying reconsideration under Rule 59(e) and Rule 60(b): (1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or prevent manifest injustice.  *See Smith v. Clark Cty. Sch. Dist.*, 727 F.3d 950, 955 (9th Cir. 2013); *Mustafa v. Clark County Sch. Dist.*, 157 F.3d 1169, 1178–79 (9th Cir. 1998); *AcandS, Inc.*, 5 F.3d at 1263; *Galiher*, 60 F. Supp. 2d at 1059.

Motions brought under Rule 59(e) and 60(b) are committed to the discretion of the trial court.  *See Casey v. Albertson's Inc*, 362 F.3d 1254, 1257 (9th Cir. 2004) ("Motions for relief from judgment pursuant to Rule 60(b) are addressed to the sound discretion of the district court and will not be

reversed absent an abuse of discretion."); *McDowell v. Calderon*, 197 F.3d 1253, 1255 n.1 (9th Cir. 1999) (noting that district courts enjoy "considerable discretion" in granting or denying a motion brought under Rule 59(e)); *United States v. Hernandez*, 2012 WL 3600295, *2 (D. Haw. Aug.20, 2012). "Mere disagreement with a previous order is an insufficient basis for reconsideration." *Comeaux v. State of Hawaii*, 2007 WL 2300711, at *1 (D. Haw. Aug. 8, 2007) (citing *Leong v. Hilton Hotels Corp.*, 689 F. Supp. 1572 (D. Haw. 1988)); *see also Bryant v. Farmer*, 460 F. App'x 644, 645 (9th Cir. 2011) (holding that reconsideration was not warranted when a prisoner simply disagreed with the court's ruling).

Furthermore, reconsideration may not be based on evidence or legal arguments that a movant could have presented at the time of the challenged decision. *See Kona Enter., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000); *Haw. Stevedores, Inc. v. HT & T Co.*, 363 F. Supp. 2d 1253, 1269 (D. Haw. 2005); *see also Exxon Shipping Co. v. Baker,* 554 U.S. 471, 485 n.5 (2008) ("Rule 59(e) permits a court to alter or amend a judgment, but it may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." (quotation marks and citation omitted)).

III.     **ANALYSIS.**

    **A.   On Remand, This Court Has Not Applied the "Conduit Theory."**

In its first argument, the County states that this court "expressly recognizes that the U.S. Supreme Court's functional equivalent analysis is applied to *the transmission path* of groundwater *from a point source*." ECF No. 486-1, PageID # 13660. The County then accuses this court of "resurrect[ing] the 'conduit theory' already vacated by the U.S. Supreme Court." *Id.*, PageID # 13662. The County is mistaken in accusing this court of such a resurrection.

In the first place, it was the Ninth Circuit that rejected the "conduit theory," which was therefore not before the Supreme Court except as part of the history of this case.

In the second place, the County is relying on out-of-context language. In support of its accusation, it quotes the following from the summary judgment order it seeks to have this court reconsider:

> While recognizing that the LWRF was not
> discharging wastewater directly into the
> Pacific Ocean, this court ruled that an NPDES
> permit was necessary because a "discharge
> into the groundwater below the LWRF is
> functionally equivalent to a discharge into
> the ocean itself." [*Hawaii Wildlife Fund, et
> al. v. County of Maui,*] 24 F. Supp. 3d 980,
> 994 (D. Haw. 2014). This court noted that
> the groundwater was the conduit by which the
> wastewater went from the LWRF wells to the
> sea, explaining, "If the point of emission is
> readily identified, and the transmission path

8

> to the ocean is clearly ascertainable, the
> discharge is functionally one into navigable
> water."  24 F. Supp. 3d at 998.

ECF No. 486-1, PageID # 13660 (quoting page 27 of this court's amended order).  The quoted language was part of this court's summary of prior proceedings, not a resurrection of anything. Indeed, the sentence immediately preceding that quotation stated, "On May 30, 2014, this court granted summary judgment to Plaintiffs, ruling that the County's failure to obtain an NPDES permit was a violation of the Clean Water Act."  Viewed in context, the language quoted by the County was clearly describing this court's 2014 ruling, before the Ninth Circuit issued the decision that was reviewed by the Supreme Court.  Accordingly, to the extent the County relies on this language in making its "resurrection" argument, that reliance is misplaced.

The County also says that this court must be resurrecting the "conduit theory" because the only way any raw volume of pollutant could reach the ocean is by means of groundwater acting as a conduit.  But even without considering the raw volume, the County must admit that the Supreme Court factors of time and distance similarly involve pollutants traveling through groundwater in this case.

**B.   This Court Did Not Err In Considering the Volume
of Wastewater Reaching Navigable Waters.**

The Supreme Court held in this case that the Clean
Water Act requires an NPDES permit "when there is a direct
discharge from a point source into navigable waters or when there
is the functional equivalent of a direct discharge."  140 S. Ct.
at 1476.  The Supreme Court provided guidance as to when there
would be and when there might not be the "functional equivalent
of a direct discharge," explaining that time and distance are
important:

> Where a pipe ends a few feet from navigable
> waters and the pipe emits pollutants that
> travel those few feet through groundwater (or
> over the beach), the permitting requirement
> clearly applies.  If the pipe ends 50 miles
> from navigable waters and the pipe emits
> pollutants that travel with groundwater, mix
> with . . . other material, and end up in
> navigable waters only many years later, the
> permitting requirements likely do not apply.

140 S. Ct. at 1476.

To provide guidance with respect to factual situations
between those extremes, the Supreme Court stated:

> Consider, for example, just some of the
> factors that may prove relevant (depending
> upon the circumstances of a particular case):
> (1) transit time, (2) distance traveled,
> (3) the nature of the material through which
> the pollutant travels, (4) the extent to
> which the pollutant is diluted or chemically
> changed as it travels, (5) the amount of
> pollutant entering the navigable waters
> relative to the amount of the pollutant that
> leaves the point source, (6) the manner by or
> area in which the pollutant enters the
> navigable waters, (7) the degree to which the

10

> pollution (at that point) has maintained its
> specific identity.  Time and distance will be
> the most important factors in most cases, but
> not necessarily every case.

*Id.*, 140 S. Ct. at 1476-77.

In granting summary judgment to Plaintiffs, this court examined each of those seven factors, ultimately determining that the LWRF's discharge was the functional equivalent of a direct discharge.  *See* ECF No. 479, PageID #s 13577-89, 13596-98.  This court determined that the minimum transit time of 84 days and the average transit time of 14 to 16 months weighed in favor of requiring an NPDES permit.  *See id.*, PageID #s 13577-82.  The court also determined that the relatively short distance the pollutant traveled (about half a mile) weighed in favor of requiring an NPDES permit, even if the pollutant traveled both horizontally and vertically through the aquifer.  *See id.*, PageID #s 13582-84.  The court determined that the nature-of-material and the extent-of-dilution or chemical-alteration factors weighed in favor of not requiring an NPDES permit.  *See id.*, PageID #s 13585-87.  The court reasoned that the amount of pollutant entering the ocean relative to the amount of pollutant leaving the point source weighed in favor of requiring an NPDES permit, as it was undisputed that 100 percent of the wastewater entered the ocean.[4]  This included what was indisputably millions of

─────────────────────

[4] At the hearing on the reconsideration motion, the County noted that pollutants placed into groundwater will always find their way into navigable waters.  Plaintiffs, on the other hand,

gallons per year entering the ocean just at the locations of a handful of monitors used in the tracer dye study.  *See id.*, PageID # 13587.  Under the circumstances of this case, the court did not place much weight on the factor examining the manner by which or area in which the pollutant entered navigable waters. *See id.*, PageID #s 13587-88.  However, the court did determine that the factor examining the degree to which the pollutant maintained its specific identity weighed in favor of requiring an NPDES permit.  *See id.*, PageID #s 13588-89.

In addition to the seven factors enumerated by the Supreme Court, this court examined three other factors.  This court determined that the EPA's system-design-and-performance factor (which has since been withdrawn) added little to the analysis, as the court had already considered much of the substance of the proposed factor in analyzing the original seven factors.  *See id.*, PageID #s 13590-92.  The court added its own factor going to the raw volume of pollutant, determining that the volume weighed in favor of requiring an NPDES permit.  The court considered a potential additional factor relating to the impact of the pollutant on the ecosystem but lacked a sufficient record

_____

noted that 100 percent of some pollutants placed into groundwater (e.g., rocks, sand, and heat, which are specifically mentioned in the Clean Water Act's definition of "pollutant") may not travel to the ocean.  In either event, there is no dispute in this case that 100 percent of the LWRF's wastewater placed in the wells reaches the ocean or that that wastewater qualifies as a pollutant when it is placed in the wells and when it emerges into the ocean.

indicating whether that weighed in favor of or against requiring the permit.  *See id.*, PageID #s 13592-96.

Balancing all the factors, this court ruled that an NPDES permit was required, noting that the court would reach this conclusion even if the court examined only the seven factors enumerated by the Supreme Court.  *See id.*, PageID #s 13597-98.

The County criticizes this court's consideration of the volume of pollutant emerging at the seeps.  *See* ECF No. 486-1, PageID #s 13660-61.  However, when the Supreme Court referred to "some of the factors that may prove relevant" before listing the seven factors, the Supreme Court appeared to recognize that other factors might influence a court's decision as to whether there was the "functional equivalent" of direct discharge. Consideration of an additional factor along with consideration of the seven other factors does not automatically create error.

The Supreme Court's seven factors do not capture the immensity of the wastewater volume flowing from the LWRF to the Pacific Ocean.  At most, one of those factors looks at "the amount of pollutant entering navigable waters relative to the amount of the pollutant that leaves the point source."  This court does not have before it any scientific study definitively establishing the precise path of most of the pollutant coming from the LWRF.  That is, the record only establishes with specificity the amount of pollutant entering the Pacific Ocean on particular dates at a handful of nearshore seeps.  This court

13

does not have details about what happens to close to 98 percent of the wastewater.  But that does not mean that a question of fact precludes summary judgment.  There is no dispute that 100 percent of the wastewater is discharged into the Pacific Ocean. If a plaintiff had to prove at trial exactly where each drop of wastewater reached the ocean, plaintiffs would be assigned an impossible task.  No plaintiff would ever be able to prove a violation of NPDES permit requirements in a groundwater case.  In that event, the Supreme Court might as well have saved itself the trouble of identifying the seven factors.

Even if this court restricts its consideration to the undisputed amount of wastewater emerging at the monitored seeps, the amount of wastewater remains enormous, about 28,000 gallons per day from Wells 3 and 4 alone.  As this court noted, "[t]hat raw volume is so high that it is difficult to imagine why it should be allowed to continue without an NPDES permit just because the other 98 percent of wastewater from the wells has not been precisely tracked."  ECF No. 479, PageID # 13593.

The County's expert, Craig Levken, talks about a hypothetical pipe running from the LWRF to the Pacific Ocean. *See* Decl. of Craig Levken, ECF No. 440-6, PageID # 11120. Imagine if that pipe was riddled with so many holes that 98 percent of the wastewater from the LWRF left the pipe and 2 percent or less reached the ocean through the pipe.  This court would have little trouble ruling that the amount that managed to

14

flow through the pipe, or about 28,000 gallons per day, was sufficient to trigger the NPDES permit requirement.  As the Supreme Court noted, the Clean Water Act requires an NPDES permit for the discharge of *any* pollutant to navigable waters from a point source.  *Hawaii Wildlife Fund*, 140 S. Ct. at 1468.  The County appears to be arguing that this court, in examining the factor focusing on "the amount of pollutant entering the navigable waters relative to the amount of the pollutant that leaves the point source," should consider only the 2 percent or less of the pollutant measured at the seeps.  However, that does not capture the entirety of the situation before this court.  All of the wastewater ultimately reaches the ocean, and even the volume of pollutant entering navigable waters at the seeps is so large that it weighs in favor of requiring an NPDES permit.

The County correctly notes that the NPDES permit requirement applies to any "person wishing to discharge *any* pollution into navigable waters." *Hawaii Wildlife Fund,* 140 S. Ct. at 1468 (2020); *Comm. To Save Mokelumne River*, 13 F.3d at 309 ("the Act categorically prohibits any discharge of a pollutant from a point source without a permit").  But that does not mean that this court must ignore the scope of the LWRF's discharge. In a way, this court's examination of the raw volume of pollutant reaching the Pacific Ocean helps to inform this court's analysis of the Supreme Court's factor examining the amount of pollution

entering navigable waters compared to the amount of pollutant leaving the LWRF.  Given the difficulty of determining exactly where wastewater from the LWRF enters the Pacific Ocean, the study presented to this court determined that only about 2 percent of the wastewater from Wells 3 and 4 enters the ocean through a handful of monitored seeps.  The path of the other 98 percent of the wastewater to the ocean has not been traced, but the 2 percent or less that we do know about is not simply a thimbleful of pollutant.  That 2 percent or less still represents about 28,000 gallons per day or millions of gallons per year (28,000 gallons per day x 365 days per year = 10,220,000 gallons per year).  So, even though the daily deposit of about 28,000 gallons represents only a small percentage of the total wastewater dumped into the injection wells, that deposit represents a huge amount of pollutant entering navigable waters. That fact militates in favor of requiring an NPDES permit.

At the hearing on the present reconsideration motion, the County criticized this court's use of the 2 percent figure, noting that the County's expert, Ericson John List, had stated: "The total mass of injected dye that would be recovered at the two spring groups is less than 2% of the dye injected.  Where the remaining 98% of the injected dye entered the ocean is unknown." Decl. of Ericson John List ¶ 10(a), ECF No. 440-2, PageID # 11065.  From this the County argued that, interpreting the scientifically reliable facts in the light most favorable to it,

16

the amount of dye measured at the seeps could be any number less than 2 percent, perhaps even 0.002 percent, and therefore would not establish that millions of gallons of sewage are reaching the ocean every year.  This argument is contradicted by the record.

Paragraph 12 of List's declaration states that Exhibit D-14 is an excerpt from his December 4, 2020, Supplemental Report.  *See* ECF No. 440-2, PageID # 11066.  Table 2 of that report estimates the percentage of tracer dye recovered from the seeps, stating that 1.15 percent of the dye was recovered from the North Seep Group and that 0.41 percent of the dye was recovered from the South Seep Group.  *See* ECF No. 440-20, PageID # 11178.  Adding those amounts, List estimates that 1.56 percent of the tracer dye was recovered at the seeps.  This is significantly more than the County's 0.002 percent figure posited during the hearing on this motion.  Even at 1.56 percent, millions of gallons of LWRF's sewage discharge into the sea every year.  This court's analysis is unaffected by a consideration of 1.56 percent instead of 2 percent.

Additionally, another County expert, Jeffrey Thompson, Ph.D., similarly says that, based on Table 3-3 of the Tracer Dye Study (ECF No. 440-10, PageID # 11176), the seeps "account for only between 0.3% and 1.0% of total outflow at the SSG and 2.1% to 7.5% of total outflow at the NSG. . . .  Applying this range of percentage to 2013 Tracer Study's seep outflow from the LWRF

results in estimates of no more than 1.6% of total injectate entering the ocean through the 183 seeps in the NSG and the 106 seeps in the SSG."  Decl. of Jeffrey Thompson, Ph.D., ¶ 18, ECF No. 440-4, PageID # 11100.

The opinions of List and Thompson (the County's own experts) establish that much more than 0.002 percent of the dye emerged at the seeps.  The County also is estopped from arguing that the amount could be 0.002 percent, having previously represented at the hearing on the counter motions for summary judgment that the record establishes what happens with respect to 1.6 percent of the injectate.  *See* Transcript of Proceedings at 24 (May 24, 2021), ECF No. 462, PageID # 13293.  The County's latest argument that the figure might be 0.002 percent is unsustainable.

Whether this court uses 2 percent or some figure closer to 1.6 percent, millions of gallons of pollutant from the LWRF are emerging at the seeps every year.  *See* Transcript of Proceedings at 47 (May 24, 2021), ECF No. 462, PageID # 13316 (County admitting at hearing on counter motions for summary judgment that tens of thousands of gallons of polluted wastewater reach the ocean every day).  The County cannot credibly maintain that the record is devoid of evidence establishing that millions of gallons of the LWRF's wastewater reach the Pacific Ocean every year.

In footnote 4 of its reconsideration motion, the County
further criticizes this court's reliance on the 2 percent figure.
The County says that this court, in its 2014 summary judgment
order, noted that 64 percent of LWRF's wastewater from Wells 3
and 4 discharged in the submarine springs area.  *See* ECF No. 486-
1, PageID # 13662.  What this court actually stated was that the
injection well study *estimated* that 64 percent of the dye
injected into Wells 3 and 4 was discharged in the submarine
springs area.  *See* ECF No. 113, PageID # 3617.  Interpreting the
evidence in the light most favorable to the County with respect
to Plaintiffs' motion for summary judgment, this court has now
focused on the undisputed fact that about 2 percent of the dye
from Wells 3 and 4 was detected at the monitored seeps located in
the submarine springs area.  This, of course, does not mean that
64 percent of the dye that was estimated to have been released in
the entire submarine springs area was not so released.  But, for
purposes of Plaintiffs' motion for summary judgment, this court
did not take into account the estimated location where 64 percent
(or any percent more than 2 percent) of the wastewater entered
the ocean.  The court simply noted the difficulty any plaintiff
would have in establishing where groundwater was percolating into
the ocean.

That difficulty is precisely why taking into account
the massive scale of the discharge makes sense.  Even if the
record does not reflect the exact path taken by 98 percent of the

wastewater the LWRF dumps into its wells, the record clearly establishes what happens with respect to about 2 percent (or approximately 28,000 gallons per day). This 2 percent is large enough in volume to allow this court to determine that there is the functional equivalent of a direct discharge such that the LWRF is required to get an NPDES permit.

Notwithstanding the difficulty of establishing exactly where and when the bulk of the wastewater enters the ocean, it cannot be overstated that all of the wastewater does indeed enter the ocean:

> There is no dispute that the wastewater put into all four injection wells finds its way to the Pacific Ocean. *See* Final Environmental Impact Statement for Construction of Sewage Collection System and Waste Water Reclamation Plant, Lahaina, Maui, Hawaii, ECF No. 432-4, PageID #10397 (noting that the LWRF wastewater "will eventually reach the ocean"); ECF No. 137, PageID # 4542 (County admitting in connection with a previous motion that the "groundwater into which LWRF Injection Wells 1 and 2 discharge conveys wastewater to the Pacific Ocean");[5] Decl. of Jean E. Moran (the Plaintiffs' expert, a hydrologist and geochemist), ECF No. 432-22, PageID # 10578 ("In my opinion, 100% of wastewater injected into any of the LWRF wells will discharge into the adjacent Pacific Ocean."); Depo. of Richard Kraft (the County's hydrologist and geologist), ECF No.

_____

[5] In the County's Reply Statement of Facts, the County says that no study has established that wastewater from Wells 1 and 2 goes into the Pacific Ocean. *See* ECF No. 445, PageID # 11599. But even if there is no such study, the County has admitted that "groundwater into which LWRF Injection Wells 1 and 2 discharge conveys wastewater to the Pacific Ocean." ECF No. 137, PageID # 4542. This court holds the County to that admission.

> 432-9, PageID # 10475 (agreeing with the
> statement that "100 percent of wastewater
> injected into any of the LWRF wells will
> discharge in the adjacent [P]acific
> [O]cean"); Remote Deposition by Videoconf. of
> Ericson John List (the County's expert, a
> civil engineer), ECF No. 432-10, PageID
> # 10483 ("If you're on an island, everything
> you put into the ground that doesn't
> evaporate goes into the ocean.  So if you're
> injecting wastewater into – treated
> wastewater into the aquifer, it's all going
> to end up in the ocean.  There's no place
> else for it to go."); Expert Report of
> Ericson John List (the County's expert), ECF
> No. 432-31, PageID # 10829 ("All waters that
> infiltrate the soil on an island must
> ultimately find their way to the sea either
> in the form of stream flows or via SS and
> diffuse flow at the shoreline or within
> adjacent coastal waters. . . .  The
> effluent[]  injected into the aquifer is no
> different in this respect; it must ultimately
> find its way to the sea."); Decl. of Adina
> Paytan (Plaintiffs' expert, an
> oceanographer), ECF No. 432-32, PageID
> # 10855 ("all of the treated wastewater
> (100%) that is injected into any of the four
> LWRF injection wells enters the Pacific
> Ocean").

ECF No. 479, PageID #s 13553-54.[6]  This circumstance also

supports this court's determination that the millions of gallons

of wastewater that the LWRF dumps into its wells are the

functional equivalent of a direct discharge.

At the hearing on the present reconsideration motion,

the County took issue with this court's statement that 100

---

[6] The record sometimes refers to "injectate" or "effluent"
that goes into the LWRF's injection wells or into the ocean.
This court uses "wastewater" when referring to the treated sewage
that the LWRF puts into its injection wells or when describing
the discharge into the Pacific Ocean.

percent of the wastewater reaches the ocean, citing PageID # 13592.  However, as detailed above, the record clearly supports that statement.

At the heart of the County's argument challenging this court's statement that 100 percent of the pollutant reaches the ocean is the County's focus on the lower toxicity of the pollutant reaching the ocean as compared to the toxicity of the wastewater before it leaves the injection wells and reaches the groundwater.  But even if the pollutant reaching the ocean has a lower toxicity, it remains a pollutant subject to the requirement for an NPDES permit.

This court stated in its summary judgment order, "If the wastewater as a whole is considered the pollutant, rather than each toxin or chemical contributing to that polluted status, then 100 percent of the pollutant reaches the sea."  *See* ECF No. 479, PageID # 13592.  The County, far from arguing that less wastewater enters the ocean than is placed into the injection wells, is asking this court to consider the changes to the wastewater before it enters the ocean as somehow rendering inapposite the notion that 100 percent of the pollutant enters the ocean.  This court's summary judgment ruling has in fact addressed the changes to the content of the wastewater in the course of applying the dilution/chemical change and specific identity factors.  *See* ECF No. 479, PageID #s 13585-87, 13588-89.

22

Moreover, even accepting the County's proposition that 86 percent of the nitrogen has been removed from the wastewater by the time it reaches the ocean, what emerges from the seeps into the Pacific Ocean is still a pollutant.

This court does not have before it evidence identifying all the other toxins that may be in the LWRF's sewage.  Any number of chemicals or toxins may remain in that sewage when it enters the ocean.  Because the Clean Water Act defines pollutants broadly as including "sewage" and municipal waste, the discharge from the wells remains a pollutant for purposes of that act even if much of the nitrogen is removed before the wastewater reaches the ocean.

The County additionally complains that this court's consideration of the amount of wastewater entering the Pacific Ocean was improper as it does not pertain to the movement and manner of transmission of pollutants.  However, the immensity of the discharge into the Pacific Ocean gives context to this case. Even without considering the massive discharge at issue, this court would find that the functional equivalent test has been satisfied.  The millions of gallons of wastewater from the LWRF entering the Pacific Ocean every year simply bolster this court's determination that a permit is required.

### C.  Reconsideration is Not Warranted by This Court's Statement About the Amount of Dye Emerging at the Seeps.

The County says this court erred when it stated that 2 percent of the dye from the tracer dye study was "recovered" at the two seeps.  The County says that this court did not take into account that the 2 percent would only be recovered over a period of time, with 50 percent of it remaining in the aquifer 300 days after injection, 30 percent of it remaining in the aquifer 400 days after injection, and 10 percent of it remaining in the aquifer 600 to 700 days after injection.[7]  The County's argument

---

[7] At the hearing on the present reconsideration motion, the County argued that this court erred in its summary judgment order in stating that "70 percent of the dye [in the 2013 tracer dye study], according to the County's expert, entered the ocean within 400 days of being placed into Wells 3 and 4."  *See* ECF No. 479, PageID # 13563.  The County contended that its expert was talking about 70 percent of the dye in the less than 2 percent of the wastewater measured at the seeps, rather than 70 percent of all of the dye placed into Wells 3 and 4.

The County's expert testified at his deposition: "Q: And your further testimony with respect to the south seep group, again for measured tracer, is that 70 percent will have entered the ocean by 400 days; correct?  A: You can infer that from what I said.  What I said is 30 percent remained resident in the aquifer.  So 30 percent is still resident; 70 percent has been released, yes.  Q: And then finally, by 600 days, 90 percent of the injected tracer would have entered the ocean; right?  A. Yes.  You did your arithmetic correctly."  ECF No. 432-10, PageID # 10480.  This is consistent with the County's own concise statement, which states, "Statistical analysis shows that of the FLT injected at wells 3 and 4, 50% was resident in the aquifer for more than 300 days after the injection, 30% was resident for more than 400 days, and 10% for more than 600-700 days."  ECF No. 440, PageID # 11054.  The County is held to its representations in its concise statement.  *See* also Local Rule 56.1(b) and (g).

misses the mark by failing to account for the continuous nature of the LWRF's discharge.

The tracer dye study illustrates the connection between LWRF's daily dumping of 3 to 5 million gallons of wastewater into its four injection wells (about 2.5 million of which was deposited daily into Wells 3 and 4, which is where the tracer dye was placed) and the emergence of the wastewater at the two monitored seeps. This court has examined the length of time it takes for the wastewater to reach the ocean in its functional equivalent analysis and does not reexamine that here. The tracer dye substitutes for the wastewater in terms of showing the path taken by the pollutant; it provides a snapshot of the conditions from which inferences can be made. That is, the tracer dye was placed into the injection wells on one day and was detected in the nearby ocean over the course of a number of subsequent days. Even if it took 3 years for all of the wastewater from a single

---

This court actually had sought clarification on how long it took before more than half of the treated wastewater injected into Wells 3 and 4 reached the Pacific Ocean. *See* ECF No. 456 Question 1(b), PageID # 11878. The County did not answer directly, stating only, "Of 3.2 million gallons injected *July 28, 2011*, half of <2% emerging in the .327 m2 seep vent area takes 300 to 400 days." ECF No. 459, PageID # 12510. The declaration of the County's expert, List, supports that statement. ECF No. 440-2, PageID 11068. This court referred to that List declaration on the same page that it made the statement about 70 percent of the dye. *See* ECF No. 479, PageID # 13563. Without addressing what may be a discrepancy between List's deposition testimony and his later declaration, this court states that, even if the court only considers the percentage of dye recovered at the seeps over time, this court's analysis remains unchanged.

day to emerge at the seeps, because the LWRF dumps millions of gallons every day into its wells, over time the cumulative effect would be for 2 percent of the daily dump to emerge at the seeps.

Suppose 100 gallons of pollutant are put into a well every day.  Further suppose that the pollutant travels at a constant rate with 25 percent of it reaching the ocean on day 2, 25 percent of it reaching the ocean on day 3, 25 percent of it reaching the ocean on day 4, and the final 25 percent of it reaching the ocean on day 5.  If 100 gallons of pollutant are added to the well every day, 50 gallons will reach the ocean on Day 3 (25 from the first 100 gallons and 25 from the second 100 gallons), 75 gallons will reach the ocean on Day 4 (25 from the first 100 gallons, 25 from the second 100 gallons, and 25 from the third 100 gallons), and 100 gallons will reach the ocean on Day 5 and every day thereafter (25 from the first 100 gallons, 25 from the second 100 gallons, 25 from the third 100 gallons, and 25 from the fourth 100 gallons).  In other words, over a period of time, the cumulative effect will be for an equivalent amount to emerge as was put in on any given day.  That same cumulative effect applies to the 2 percent of the LWRF wastewater emerging at the seeps.

This court admittedly does not know the precise amount of pollutant being discharged every day into the ocean at the seeps.  But no party has claimed that a trial would provide a better record on that subject than the court now has.  What is

clear is that, whether that amount is a little more or a little less on any given day, millions of gallons of pollutants are entering the ocean every year at the seeps.

D.   **The County Has Waived Any Argument That the Treated Wastewater Is Not a Pollutant For Purposes of the Clean Water Act.**

The County's position on whether the wastewater entering the Pacific Ocean is a pollutant is not entirely clear. In its reconsideration briefing, the County argued that this court committed a manifest error when it stated on pages 30 and 31 of its amended order:

> There is no dispute that the LWRF is a "point source," that the Pacific Ocean is a "navigable water," or that the wastewater discharged into the Pacific Ocean is a "pollutant." *See id.*, Kavanaugh, J., concurring, 140 S. Ct. at 1478 ("No one disputes that pollutants originated at Maui's wastewater facility (a point source), and no one disputes that the pollutants ended up in the Pacific Ocean (a navigable water)."). This case turns on whether the LWRF's placement of wastewater into injection wells from which the wastewater flows to the Pacific Ocean is the "functional equivalent of a direct discharge" from the LWRF into the Pacific Ocean. *Id.*

ECF No. 486-1, PageID #s 13649, 13656, 13666 (arguing that this court's treatment of wastewater as a pollutant was in error and did not meet the definition of a pollutant in 33 U.S.C. § 1362(6)).  Specifically, the County complained that this court erred in determining that LWRF's wastewater was a pollutant. This, however, was not in dispute until the County said it was in

the present reconsideration motion.  In waiting to raise this
matter until the reconsideration phase, the County has waived
this argument.

At the hearing on the present reconsideration motion,
this court asked the County to point out where in the record it
might have raised this issue earlier.  At that point, the County
said it was not challenging the treatment of the wastewater as a
pollutant.  This should have ended the matter, but it did not.
The County complicated the discussion by then alternating between
referring to the wastewater as a pollutant and referring to the
components of the wastewater, like nitrogen, as the true
pollutants.  Because the County's changing positions and
alternating uses of the term "pollutant" have created confusion,
this court proceeds to address all of the County's assertions on
this score.

In footnote 3 of this court's Amended Order, ECF No.
479, PageID # 13554, this court stated, "The record sometimes
refers to 'injectate' or 'effluent' that goes into the LWRF's
injection wells or into the ocean.  This court uses 'wastewater'
when referring to the treated sewage that the LWRF puts into its
injection wells or when describing the discharge into the Pacific
Ocean."  The Clean Water Act defines "pollutant" broadly,
including in its definition "dredged spoil, solid waste,
incinerator residue, **sewage**, garbage, sewage sludge, munitions,

chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt **and** industrial, **municipal**, and agricultural **waste discharged into water**."  33 U.S.C. § 1362(6) (emphasis added).  It therefore makes sense that the parties proceeded for years in this case never disputing that the LWRF's treated wastewater (treated sewage) qualified as a "pollutant."

In Plaintiffs' motion for summary judgment, they stated, "Here, Defendant has never disputed that (1) the LWRF's treated sewage is a 'pollutant,' (2) the nearshore ocean receiving that pollution is a 'navigable water,' (3) the injection wells are 'point sources,' and (4) Defendant lacks an NPDES permit for discharges from the LWRF injection wells."  *See* ECF No. 431-1, PageID # 10337.  Plaintiffs were seeking a ruling stating that the LWRF's discharge of treated wastewater without an NPDES permit violated the Clean Water Act.  In aid of obtaining such a ruling they argued that the LWRF's discharge of treated wastewater was the functional equivalent of a direct discharge of a pollutant into the Pacific Ocean.  In opposing Plaintiffs' motion for summary judgment, the County did not argue that the LWRF's treated sewage or wastewater failed to qualify as a pollutant.  If the County had wanted to raise that argument, it was incumbent on the County to do so before this court granted summary judgment in favor of Plaintiffs.  The County's opposition

never contested Plaintiffs' statement that the LWRF's treated sewage or wastewater qualified as a pollutant for purposes of the Clean Water Act.  *See* ECF No. 442-1.

Indeed, in its Brief for Petitioner to the Supreme Court, the County had stated, "There is no disagreement that the pollutants here reached navigable water only by way of groundwater."  2019 WL 2085683, *5 (2019).  Thus, the Supreme Court proceeded with the understanding that the discharges reaching the ocean were pollutants.

It is only after this court ruled and judgment was entered that the County, for the first time, challenged the description of the discharges as pollutants.  This challenge is untimely.  *See Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 880 (9th Cir. 2009) ("A motion for reconsideration 'may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation.'" (quoting *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000)); *Soriano v. Countrywide Home Loans, Inc.*, 2011 WL 2175603, at *3 (N.D. Cal. June 2, 2011) ("when a party faces a burden in opposing a motion for summary judgment, waiver can occur if the party fails to carry that burden by making argument or introducing evidence, loses summary judgment, and then moves for reconsideration on the basis of information it had access to when opposing the summary

judgment motion"); *see also Exxon Shipping,* 554 U.S. at 485 n.5
(holding that Rule 59(e) may not be used to raise arguments or
present evidence that could have been raised prior to the entry
of judgment).  The County may not now seek to vacate the judgment
by making an argument that it could have made before summary
judgment was granted in Plaintiffs' favor.

 This court notes that the County also argues that this
court erred when it stated "that treated wastewater 'as a whole
is [or can be] considered a pollutant.'"  *See* ECF No. 486-1,
PageID # 13667.  The County takes the court's language out of
context.  This court's full statement was as follows:

> The Supreme Court's seven factors discussed
> above are not necessarily the only factors
> relevant to a determination of whether the
> wastewater from the wells is the functional
> equivalent of a direct discharge into
> navigable waters.  The Supreme Court
> identified those factors as circumstances
> "that may prove relevant (depending on the
> circumstances of a particular case)."
> Something not captured in those seven factors
> is the immensity of the wastewater volume.
> At most, one of those factors looks at "the
> amount of pollutant entering navigable waters
> relative to the amount of the pollutant that
> leaves the point source."  **If the wastewater
> as a whole is considered the pollutant,
> rather than each toxin or chemical
> contributing to that polluted status, then
> 100 percent of the pollutant reaches the sea.**
> But just referring to 100 percent does not
> fully capture how much wastewater is
> traveling from the wells to the Pacific
> Ocean.  As noted at the start of this order,
> more than a million gallons of wastewater is
> discharged from a single well every day, all
> of it going to the sea.

ECF No. 479, PageID # 13592 (emphasis added).

The County's use of quotation marks and brackets leaves a misleading impression, although it is correct that this court treated the LWRF's sewage or wastewater as a pollutant given the absence of any dispute about the matter.  Under these circumstances, the County has waived any argument that the wastewater as a whole, regardless of how much or how little it contains of any particular toxin or  chemical, is not a pollutant.

Even if the wastewater that reaches the sea has a reduced amount of nitrogen in it, what reaches the sea is still a pollutant for purposes of the Clean Water Act.  The Clean Water Act's definition of "pollutant" does not speak to individual chemicals that might be contained in a substance like wastewater.  Instead, that definition refers to substances likely to contain a multitude of chemicals, none of which is mentioned by the Clean Water Act.

This court examined the diminished nitrogen in balancing the seven functional-equivalent factors.  The County's present focus on the reduced amount of nitrogen in the wastewater that enters the sea does not warrant reconsideration.  *See* ECF No. 479, PageID #s 13585-87 (determining that the dilution/chemical-change factor weighs in favor of not requiring an NPDES permit).  The LWRF's sewage or municipal waste, which

this court has called "wastewater," is the relevant pollutant, not nitrogen.

In any event, to the extent the County is arguing that this court should be examining the individual toxins or chemicals in the treated wastewater, the County's argument results in a distinction without a difference.  Under the Supreme Court's functional equivalent test, this court examines how the pollutant has changed while going from the point source to navigable waters.  Here, the only changes the County pointed to were the mixing of the wastewater with groundwater and the lessening of nitrogen.  *See* ECF No. 442-1, PageID #s 11362-62, 11364-65.  This court has already examined both changes.

The court is also unpersuaded by the County's slippery slope argument.  The county postulates that, if the wastewater itself is a pollutant, then there is a possibility that landowners using reclaimed wastewater might have to get an NPDES permit.  Any such possibility would require this court to examine whether there was a point source discharging a pollutant into navigable waters in a manner functionally equivalent to a direct discharge.  While there is a possibility that treated wastewater used to water land could find its way to the aquifer and then into the ocean, whether that would trigger NPDES permitting requirements depends on the circumstances and is not, in any event, now before this court.

This court does not know whether the reclaimed wastewater being supplied to landowners is the same as the treated wastewater being dumped into the wells.  Nor is there anything in the record establishing that the reclaimed wastewater is actually flowing into the aquifer.  The County's analogy may be inapposite.  Certainly the present record is insufficient to allow this court to apply the Supreme Court's seven factors to that purported analogy.

**E.    This Court Committed No Error in Declining to Give Deference to What is Now a Withdrawn Agency Guidance.**

On January 14, 2021, the EPA issued "guidance to the regulated community and permitting authorities" regarding the determination of whether a discharge of a pollutant into groundwater that then travels to navigable water is or is not subject to the NPDES permitting requirements.  *See* ECF No. 473-2 (copy of Guidance Memorandum).  The EPA itself noted that its guidance "d[id] not have the force and effect of law and it does not bind the public in any way."  *Id.* n.1, PageID # 13491.  The County argues that this court erred in failing to give the EPA's guidance deference or more weight despite this court's determination that the EPA's proposed system-design-and-performance factor did not add anything to the analysis in this case.

34

Since the filing of the County's motion for reconsideration, the EPA has withdrawn the guidance.  *See* ECF No. 490-1.  The EPA explained why it was withdrawing the guidance:

> Although the guidance stated that it lacked the force and effect of law, the Office of Water is rescinding the guidance for two primary reasons.  First, the eighth factor identified in the guidance as part of the "functional equivalent" analysis and described as "the design and performance of the system or facility from which the pollutant is released," is not consistent with the Clean Water Act or the Supreme Court decision in *County of Maui v. Hawaii Wildlife Fund* because, among other things, the additional factor introduces an element of intent that is not reflected in or consistent with the *County of Maui* decision. 140 S. Ct. 1462 (2020) (*County of Maui*).  Second, the guidance was issued without proper deliberation within EPA or with our federal partners.

*Id.*

This court cannot be said to have erred in failing to follow guidance that is no longer valid and that the federal agency itself thinks was wrong and improperly issued.

35

**IV.        CONCLUSION.**

For the foregoing reasons, the motion for reconsideration is denied.


IT IS SO ORDERED.

DATED: Honolulu, Hawaii, October 20, 2021.



 /s/ Susan Oki Mollway
Susan Oki Mollway
United States District Judge


Hawaii Wildlife Fund, et al. v. County of Maui; Civil No. 12-00198 SOM/KJM; ORDER DENYING MOTION FOR RECONSIDERATION